**Donnell JEFFERS, Plaintiff–Appellee,**

v.

**James GOMEZ, Director, California Department of Corrections; Theo White, Warden, California State Prison at Sacramento; Sam Bess, Correctional Officer at California State Prison at Sacramento; Margaret Yerby, Correctional Officer at California State Prison at Sacramento, Defendants–Appellants.**

Nos. 99–15867, 99–15870, 99–15868, 99–15869.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Sept. 14, 2000

Filed Feb. 20, 2001

Amended Oct. 3, 2001

Jesse M. Rivera, Michael E. Vinding, Law Offices of Moreno & Rivera, Sacramento, California, for defendant-appellant Sam Bess.

Douglas P. Adams, John A. Mason, Adams & Mason, Inc., Sacramento, California, for defendant-appellant Margaret Yerby.

John D. Adkisson, Sacramento, California, for defendant-appellant James Gomez.

Jennifer Weck, Deputy Attorney General, San Diego, California, for defendant-appellant Theo White.

John H. Scott, San Francisco, California, for the plaintiff-appellee.

Before: ALDISERT,* KOZINSKI** and GRABER, Circuit Judges.

### ORDER

The opinion filed on February 20, 2001, and appearing at 240 F.3d 845, is amended in accordance with the attached amended opinion.

With these amendments, the panel has voted to deny the petition for rehearing. Judges Kozinski and Graber have voted to deny the petition for rehearing en banc, and Judge Aldisert has so recommended.

* Ruggero J. Aldisert, Senior Judge, United States Court of Appeals for the Third Circuit, sitting by designation.

** Following oral argument before Judges Graber and Aldisert, Judge Kozinski was drawn to replace Judge Fisher.

The full court was advised of the petition for rehearing en banc. A judge of the court requested a vote on whether to rehear the matter en banc. The matter failed to receive a majority of the votes of the nonrecused active judges in favor of en banc consideration. Fed. R.App. P. 35(b).

The petition for rehearing and petition for rehearing en banc are DENIED.

## OPINION

PER CURIAM.

These appeals by California correctional officers, a former prison warden and the former state Director of the Department of Corrections from the denial by the district court of their motions for summary judgment on the ground of qualified immunity require us to decide whether emergency responses and prison security measures, undertaken to control a large-scale disturbance in a prison yard, constituted Eighth Amendment violations under circumstances in which Appellee Donnell Jeffers, an inmate, was wounded by a rifle shot fired by a correctional officer.

To determine whether the rights assured Jeffers by the Eighth Amendment were violated, we must examine " 'whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.' " *Whitley v. Albers*, 475 U.S. 312, 320–21, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986) (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir.1973) (Friendly, J.)).

Jeffers was shot in the neck during a major prison disturbance at California State Prison–Sacramento ("CSP–Sac") on September 27, 1996. He sued correctional officers at CSP–Sac, the former warden at CSP–Sac and the former director of the California Department of Corrections ("CDC") under 42 U.S.C. § 1983 for Eighth and Fourteenth Amendment violations and under various California constitutional and statutory provisions. Appellants, who unsuccessfully moved for summary judgment on the basis of qualified immunity, bring interlocutory appeals of the district court's partial denials of their motions.

Sam Bess and Margaret Yerby, correctional officers at CSP–Sac, are Appellants at Nos. 15869 and 15870; Theo White, former warden at CSP–Sac, appeals at No. 99–15868; and James Gomez, former director of the CDC, appeals at No. 99–15867. These appeals, which have been consolidated, require us to decide whether the district court erred in failing to grant the motions for summary judgment based on qualified immunity brought by the Appellants.

### I.

Jeffers' original complaint, filed on July 22, 1997, contains 18 claims for relief. He alleges that: (1) all defendants violated protections assured by the Eighth Amendment; (2) Gomez and White violated the Eighth and Fourteenth Amendments by knowingly using customs, policies or practices which authorized and encouraged the use of excessive force; (3) all defendants deprived him of liberty without due process of law; (4) all defendants demonstrated deliberate indifference to his personal security in violation of the Fourteenth Amendment; (5) all defendants violated the Eighth and Fourteenth Amendments by inflicting upon him unnecessary and wanton pain; (6) Gomez and White violated the Eighth and Fourteenth Amendments by failing to properly train and supervise custodial staff with respect to the use of deadly force; and (7) the actions of Bess and Yerby were racially motivated in violation of his right to equal protection. Claims (8) through (18) were various state

constitutional and statutory claims against Bess and Yerby.

By consent of the parties, the case was assigned to a magistrate judge. Appellants moved for summary judgment on all claims. The district court granted summary judgment on some claims, but it denied relief on motions brought by Gomez and White on Jeffers' Eighth and Fourteenth Amendment claims and virtually all motions brought by Yerby and Bess. The court concluded that there were disputed issues of material fact as to the intent of Yerby and Bess when they fired their rifles and that a jury should determine whether they fired in a good-faith effort to maintain or restore discipline or whether they acted maliciously and sadistically with the intent to cause harm. The court also decided that the evidence presented by Jeffers gave rise to triable issues of fact as to (1) whether Gomez and White were aware of an excessive number of inmate shootings by prison guards in California prisons prior to the disturbance during which Jeffers was shot, (2) whether California prison guards were shooting inmates at an unusually high rate in comparison to guards in the rest of the country, and (3) whether correctional officers were properly trained and supervised in the use of force and in procedures to notify superiors of a potentially dangerous incident.

The court held that none of the defendants were entitled to summary judgment on the basis of qualified immunity.[1] We disagree. We hold that the material facts in this case are not in dispute and that Appellants are entitled to qualified immunity. Accordingly, we reverse the denial of the motions for summary judgment.

## II.

On September 27, 1996, a "major racial disturbance" occurred when groups of Hispanic inmates attacked Black inmates in the main yard at B facility at CSP–Sac. The disturbance involved between 150 and 200 inmates and lasted approximately thirty minutes, and is regarded as one of the largest disturbances in the history of the Department of Corrections. The guards used side-handled batons, pepper spray, .37 mm launchers and mini–14 rifles to quell the disturbance. In the process, seven guards fired twenty-one rounds from the mini–14 rifles. The rifle fire injured four inmates, including Jeffers, and killed a fifth inmate.

### A.

Appellant Bess testified that, before the inmates were released into the prison yard, another correctional officer told Bess that he had heard from an inmate that "the Hispanics were planning to hit the Blacks that morning." After investigating the matter and determining that, "at most, the Hispanic inmates were going to do a 'housecleaning' (i.e., assault one of their own group)," Bess' superiors, Captain Walker and Sergeant Baughman, decided to send the inmates into the yard. Shortly after the inmates were released, Bess noticed that the Hispanic inmates did not commence their regular yard activities, but instead walked toward an area of the yard routinely occupied by Black inmates. Because of this unusual behavior, Bess called Yerby to come to the window in the tower where they were stationed. After witnessing five Hispanic inmates "running and attacking [other] inmates," both Bess and

---

1. Jeffers abandoned claims (8) through (18) against Gomez and White and, in his amended complaint, he alleges that only Bess' actions were racially motivated in violation of the Equal Protection Clause. He does not appeal the denial of summary judgment of the state constitutional and statutory claims.

Yerby yelled "yard down!" Bess then saw an Hispanic inmate with a weapon in his hand chasing a group of Black inmates. He put down his .37–mm launcher, grabbed his mini–14 rifle and fired a warning shot.[2]

Approximately ten seconds after firing this warning shot, Bess attempted to "sight" an Hispanic inmate who was trying to stab other inmates with a weapon. Bess attested that, while he intended to shoot this Hispanic inmate, he decided that there were too many obstructions preventing a clear shot, so he fired a second warning shot into the wall. After the second shot, Bess saw a Black inmate come up from a "down" position with an unidentified weapon in his hand. Bess fired to disable the Black inmate when he saw him raise his weapon in an apparent stabbing motion. Bess aimed for the inmate's upper left arm, near the shoulder, but he believes that he missed him. After he fired this third shot, he saw an officer escort a wounded inmate out of the yard. Bess fired four other shots during the disturbance, but those shots were fired in areas of the yard other than where Jeffers was injured.

### B.

Appellant Yerby testified that at the outset of the disturbance, when she observed Hispanic and Black inmates fighting, both she and Bess yelled "yard down," and she heard "yard down" coming over the public address system. She then witnessed an Hispanic inmate, wielding a knife-like weapon in his right hand, back a Black inmate up against a wall. When she observed the Hispanic inmate make an underhanded stabbing motion toward the Black inmate, Yerby fired her weapon, aiming for the Hispanic inmate's right hand. She fired this shot at approximately the same time that Bess fired his third shot. Because she had a clear shot of the Hispanic inmate's right hand, Yerby did not feel that the Black inmate was at risk of being shot. However, she admitted in her deposition that it was possible that her shot could have ricocheted off the wall and hit the Black inmate. Additionally, approximately twenty minutes later, Yerby fired a warning shot into an unoccupied area when she observed prison staff in imminent danger.

### C.

Appellee Jeffers estimated that he was shot during the first ninety seconds of the disturbance.[3] He stated that he was playing chess at a bench when he was attacked by an unidentified Hispanic inmate who was wielding a weapon consisting of a five to six-inch nail with a plastic handle. The attacker "nicked" Jeffers' cheek. Jeffers was holding his attacker's arms to fend off any further attack when he was shot. Jeffers was charged with, but found not guilty of, "participation in a racial disturbance." He does not know definitively the identity of the person who shot him, but he alleges that it was either Bess or Yerby.

### D.

Following the disturbance, the Investigative Services Unit was also unable to determine who shot Jeffers. A Shooting Review Board ("Board") was convened to determine whether the shots fired were within the CDC's shooting policy ("Shooting Policy"). The Board was unable to determine who shot Jeffers, but narrowed

---

**2.** As the magistrate judge noted, the .37–mm launcher is designed to knock down or disable a person, and is less lethal than the rifle.

**3.** This was the conclusion of the Shooting Review Board.

it down to Bess or Yerby. Ultimately, the Board concluded that it was more likely that Yerby shot him, because "Jeffers described the situation in which he was shot in much the same terms as Officer Yerby describes the scenario in which she fired for effect." The report also notes that, "[r]egardless of the officer who fired the shot, there is a possibility that Jeffers was not the intended target and was hit by accident." The Board determined that the shots fired by Bess and Yerby were within the Shooting Policy.

The District Attorney's office eventually filed a report, concluding that there was insufficient evidence to establish that any of the officers who fired their rifles during the disturbance acted criminally and ruling that the shooting of Jeffers was accidental. The District Attorney's report also states that Jeffers "does not believe that the staff shot him intentionally."

### III.

■■■ As an initial matter, we address whether we have jurisdiction over these consolidated interlocutory appeals. Although the denial of summary judgment is not ordinarily an appealable order, we have jurisdiction to consider an interlocutory appeal when, as here, the ground for the motion is qualified immunity. *Schwenk v. Hartford,* 204 F.3d 1187, 1195 (9th Cir.2000) (citing *Behrens v. Pelletier,* 516 U.S. 299, 312, 116 S.Ct. 834, 133 L.Ed.2d 773 (1996)); *see also P.B. v. Koch,* 96 F.3d 1298, 1301 (9th Cir.1996) (holding that, when there was a claim of excessive force on the part of a school principal, the district court's denial of qualified immunity on summary judgment was appealable immediately). Our jurisdiction in these matters generally is limited to questions of law and does not extend to claims in which the determination of qualified immunity depends on disputed issues of material fact.

*See Schwenk,* 204 F.3d at 1195 (citing *Johnson v. Jones,* 515 U.S. 304, 319, 115 S.Ct. 2151, 132 L.Ed.2d 238 (1995)). Where disputed facts exist, however, we can determine whether the denial of qualified immunity was appropriate by assuming that the version of the material facts asserted by the non-moving party is correct. *Id.* (citing *Behrens,* 516 U.S. at 312, 116 S.Ct. 834). Consequently, we evaluate Appellants' claims of qualified immunity by resolving all factual disputes in Jeffers' favor. *See id.*

Although those jurisdictional principles are easily stated, their application can be anything but simple. In this case, it is clear that we have jurisdiction over the appeals of defendants White and Gomez, because their appeals present straightforward issues of law. It is not immediately obvious that we have jurisdiction over the appeals of defendants Bess and Yerby, because the district court denied them qualified immunity on the basis that there remained issues of material fact regarding their motives. However, a careful review of our cases and those of the Supreme Court leads us to conclude that we have jurisdiction over all the appeals before us.

### A. *Johnson, Behrens, and Their Progeny*

In *Johnson v. Jones,* 515 U.S. 304, 319–20, 115 S.Ct. 2151, 132 L.Ed.2d 238 (1995), the Supreme Court held that an appellate court lacks jurisdiction over an interlocutory appeal of a denial of qualified immunity to the extent that the trial court's determination turns on its conclusion that "the pretrial record sets forth a 'genuine' issue of fact for trial." That is, an appellate court lacks jurisdiction over an interlocutory appeal challenging the sufficiency of the evidence supporting the trial court's conclusion that an issue of fact exists. *Id.* at 313, 115 S.Ct. 2151.

The Supreme Court gave a cautious reading of *Johnson* just a few months later, in *Behrens.* There, the district court denied the defendant's motion for summary judgment on qualified-immunity grounds because, in its view, " '[m]aterial issues of fact remain as to defendant Behrens on the *Bivens* claim.' *Pelletier v. Federal Home Loan Bank of San Francisco,* No. CV 89–0969 (CD Cal., Sept. 6, 1994). . . . [T]he Ninth Circuit dismissed the appeal 'for lack of jurisdiction.' *Pelletier v. Federal Home Loan Bank of San Francisco,* No. 94–56507 (CA9, Nov. 17, 1994)." *Behrens,* 516 U.S. at 304–05, 116 S.Ct. 834. In context, our court seems to have been rejecting the defendant's right to bring a second interlocutory appeal (following summary judgment, when an earlier appeal had followed a motion to dismiss); but in reversing our holding as to lack of jurisdiction, the Court took pains to discuss the alternative *Johnson* theory. The Supreme Court sent the case back to the Ninth Circuit for consideration on the merits saying, among other things:

> [R]espondent asserts that appeal of denial of the summary-judgment motion is not available because the denial rested on the ground that "[m]aterial issues of fact remain." This, he contends, renders the denial unappealable under last Term's decision in *Johnson v. Jones,* 515 U.S., at 313–318, 115 S.Ct., at 2156–2158. That is a misreading of the case. *Denial of summary judgment often includes a determination that there are controverted issues of material fact, see Fed. Rule Civ. Proc. 56, and Johnson surely does not mean that every such denial of summary judgment is nonappealable. Johnson* held, simply, that determinations of evidentiary sufficiency at summary judgment are not immediately appealable merely because they happen to arise in a qualified-immunity case; *if what is at issue in the sufficiency determination is nothing more than whether the evidence could support a finding that particular conduct occurred, the question decided is not truly "separable" from the plaintiff's claim, and hence there is no "final decision" under* Cohen [v. Beneficial Industrial Loan Corp., *337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949),]* and Mitchell [v. Forsyth, *472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985)].* See 515 U.S., at 313–318, 115 S.Ct., at 2156–2158. *Johnson* reaffirmed that summary judgment determinations **are** appealable when they resolve a dispute concerning an "abstract issu[e] of law" relating to qualified immunity, *id.,* at 317, 115 S.Ct., at 2158—typically, the issue whether the federal right allegedly infringed was "clearly established," see, *e.g., Mitchell, supra,* at 530–535, 105 S.Ct., at 2817–2820; *Davis v. Scherer,* 468 U.S. 183, 190–193, 104 S.Ct. 3012, 3017–3019, 82 L.Ed.2d 139 (1984).

*Behrens,* 516 U.S. at 312–13, 116 S.Ct. 834 (emphasis added; emphasis in original in boldface).

After *Behrens,* we have clarified that *any* issue of law, including the materiality of the disputed issues of fact, is a permissible subject for appellate review.

For example, in *Knox v. Southwest Airlines,* 124 F.3d 1103 (9th Cir.1997), a civil rights action, we responded to a contention that we lacked jurisdiction over the defendants' appeal from an order denying summary judgment based on qualified immunity. The district court had ruled that there was a disputed issue of fact as to "whether the officers had probable cause to arrest Knox." *Id.* at 1105. After discussing the then-recent opinion in *Behrens,* we said:

> Thus, we have jurisdiction over an interlocutory appeal from the denial of qualified immunity where the appeal fo-

cuses on whether the defendants violated a clearly established law given the undisputed facts, while we do not have jurisdiction over an interlocutory appeal that focuses on whether there is a genuine dispute about the underlying facts. *See Armendariz v. Penman,* 75 F.3d 1311, 1317 (9th Cir.1996) (en banc) ("[W]e have jurisdiction to review the district court's decision that the defendants' alleged conduct violated clearly established law, but the collateral order doctrine does not provide appellate jurisdiction to review the district court's decision that genuine issues of material fact exist for trial."). *Even if disputed facts exist about what actually occurred, a defendant may still file an interlocutory appeal if the defendant's alleged conduct in any event met the standard of objective legal reasonableness under clearly established law regarding the right allegedly infringed. See Behrens,* [516 U.S. at 313], 116 S.Ct. at 842.

*Id.* at 1107 (emphasis added). We then distinguished *Johnson,* in which the defendant simply denied having committed the complained-of acts at all, from a case like *Knox,* which presents the issue whether the alleged conduct violated a clearly established legal standard. *Id.*

Similarly, in *Schwenk,* we considered on the merits the defendant's appeal from a denial of a motion for summary judgment. The plaintiff, a transsexual prisoner, had brought an Eighth Amendment claim based on the defendant's forcible sexual assault. 204 F.3d at 1193–94. Concerning our jurisdiction, we held:

> [T]his court is not precluded from reviewing [an order denying summary judgment based on qualified immunity] on appeal merely because some of the facts are disputed; rather, for purposes of determining whether the alleged conduct violates clearly established law of

> *which a reasonable person would have known, we assume the version of the material facts asserted by the non-moving party to be correct.* ·On this appeal, then, we consider whether, resolving all factual disputes in [the plaintiff's] favor, [the defendant] is entitled to qualified immunity from [the plaintiff's] claims.... We conclude that he is not entitled to qualified immunity with respect to Section 1983—the Eighth Amendment claim....

*Id.* at 1195 (citations omitted) (emphasis added). We explained that no reasonable prison guard could possibly have believed, at the time of the sexual assault, that such conduct was constitutional. *Id.* at 1196–98.

Other circuits share our view on the availability of interlocutory review of a denial of qualified immunity premised on the existence of a disputed issue of material fact. *See, e.g., Farmer v. Moritsugu,* 163 F.3d 610, 614 (D.C.Cir.1998) (holding that jurisdiction exists when the defendant "has effectively conceded the facts as alleged by [the plaintiff], contesting instead whether those facts could support a conclusion that he violated [the plaintiff's] constitutional rights"); *Winfield v. Bass,* 106 F.3d 525, 530 (4th Cir.1997) (en banc) ("[W]e have jurisdiction over a claim that there was no violation of clearly established law accepting the facts as the district court viewed them."); *Salim v. Proulx,* 93 F.3d 86, 90 (2d Cir.1996) ("An appeal is available ... to challenge the trial judge's rejection of the immunity defense where the defendant contends that ... on the facts that the plaintiff alleges are true, ... the immunity defense is established as a matter of law....").

■ From *Behrens* and its progeny we conclude that we may consider the legal question whether, taking all facts and inferences therefrom in favor of the plaintiff, the defendant nevertheless is entitled to

qualified immunity as a matter of law. Ordinarily, that is a question that we can, and should, answer in an appeal of this kind. But the plot thickens when we turn to the problem of applying that general rule when the context is a tort claim in which *motive* is an essential element. *Johnson* does not give us the answer; as the First Circuit put it:

> *Johnson* involved a factual dispute about what occurred, not an issue of motive, and its full implications for motive cases may not have been entirely apparent. Given the policies set forth in *Harlow [v. Fitzgerald*, 457 U.S. 800, 817–18, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)], and *Anderson [v. Creighton*, 483 U.S. 635, 641, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)], officials arguably do need some special protection against charges of improper motive, which are easily made and which may be supported simply by an alleged remark of the defendant made when only the plaintiff was present. The problem for officials facing such lawsuits is very real.

*Tang v. Rhode Island*, 120 F.3d 325, 327 (1st Cir.1997) (citation omitted).

### B. The Relationship Between Qualified Immunity and Motive

*Crawford–El v. Britton*, 523 U.S. 574, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998), provides some guidance as to how we should approach an interlocutory appeal in a case in which the district court has denied qualified immunity because issues of fact remained regarding the defendant's motive. *Crawford–El* states that, "although evidence of improper motive is irrelevant on the issue of qualified immunity, it may be an essential component of the plaintiff's affirmative case." *Id.* at 589, 118 S.Ct. 1584. In context, *Crawford–El* appears to be speaking about the kind of motive considered in *Harlow v. Fitzgerald*, 457 U.S. 800, 817–18, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), where the plaintiff alleges that the defendant's objectively reasonable conduct was motivated by malice. But some constitutional rights involve freedom *only* from governmental action taken because of a bad motive. In such cases, the question whether the officer's conduct was "objectively" reasonable inevitably requires us to look at whether a reasonable officer could have known that acting with a particular mental state violated the plaintiff's rights.

In a case involving a motive-related claim, the question of motive can arise during the qualified-immunity inquiry in three ways. First, it may be clear to any reasonable officer that engaging in Conduct X with Motive Y is unconstitutional, but there is a factual question whether the conduct occurred. If the district court identifies that kind of factual dispute, *Johnson* and *Crawford–El* say that we have no work to do on appeal.

Second, there may be no question that Conduct X occurred and that Motive Y was present, but there is a legal question whether Motive Y is permissible. The availability of qualified immunity in such a case naturally turns on whether it was "clearly established law" that Motive Y was impermissible. Nothing in *Johnson* or *Crawford–El* suggests that we are precluded from answering a legal question of that kind.

The third scenario is a case in which Conduct X is undisputed, but it is disputed whether the defendant possessed Motive Y. No reasonable defendant could believe that doing X with Motive Y is constitutional; but *every* reasonable defendant would believe that doing X with Motive Z is constitutional.

That is the kind of case we have here with respect to defendants Bess and Yerby. Because qualified immunity is de-

signed to protect defendants even from defending the action, it is not enough of an answer to say that the defendant should just wait to win on the merits.

Thus, we must resolve whether we have jurisdiction to review the district court's ruling in this third kind of case when there is an *allegation* of bad motive, but *no evidence* of bad motive, and when the evidence, viewed in the light most favorable to the plaintiff, demonstrates that the defendant's conduct was not objectively unreasonable, but the district court nevertheless denies summary judgment, ruling that the defendant's motive is in dispute. When there is an *allegation* about the conduct part of the equation, but insufficient *evidence* of that conduct to create a genuine issue of material fact, our cases permit review.

■ Here, we must decide whether the usual analysis changes just because a case involves allegations that a defendant acted with a certain mental state. Logic suggests that the answer should be "no." Although we must accept all the plaintiff's factual allegations as true, he must do more than simply allege that the defendants acted with an improper motive in order to survive summary judgment. He must " 'put forward specific, nonconclusory factual allegations' that establish improper motive." *Crawford–El,* 523 U.S. at 598, 118 S.Ct. 1584 (quoting *Siegert v. Gilley,* 500 U.S. 226, 236, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991) (Kennedy, J., concurring in judgment)). *Crawford–El* applied that specificity requirement in reviewing summary judgment on a plaintiff's affirmative case, but there is no principled reason why we should use a different standard in reviewing summary judgment on the affirmative defense of qualified immunity.

Indeed, after *Crawford–El,* we have applied this specificity requirement when considering the appropriateness of summary judgment on the affirmative defense of qualified immunity, even when the disputed issue is motive. In *Cunningham v. Gates,* 229 F.3d 1271, 1284 (9th Cir.2000), we reviewed a district court's order denying summary judgment on a qualified-immunity defense, invoking the collateral order doctrine. We acknowledged that our jurisdiction is limited to legal issues. *Id.* Notwithstanding that limitation, we reversed the district court and, further, granted qualified immunity (and summary judgment) to several defendants on several claims because of a dearth of evidence. For example, with regard to a claim that nonshooting officers had fabricated evidence, we said:

> The plaintiffs offer not an iota of evidence that the non-participating officers in this case ever fabricated evidence. Rather, plaintiffs rely on conclusory allegations and a report published by the Christopher Commission several years before the events giving rise to the instant actions, which says nothing about the individual conduct of any of the officers involved in the action. Given the complete lack of evidence suggesting any of the defendant officers fabricated evidence, we find that none of the defendant officers can be held liable for their alleged involvement in fabricating evidence.

*Id.* at 1291–92. More specific to the question of motive, we also considered the plaintiffs' claims that city council members had promoted and ratified the use of excessive force by voting to indemnify police officers against punitive damages awards. If the council members had acted *in bad faith* in making those decisions, then they were not entitled to qualified immunity. But they were entitled to qualified immunity, and summary judgment, if no genuine issue existed on the material fact of wheth-

er they had acted in bad faith when they made the indemnification decisions:

> In order to defeat the council members' motion for summary judgment in the Smith case, Smith must present some evidence that the council members did not implement section 825's indemnification procedure in good faith.... Smith failed to meet this burden.

*Id.* at 1293. The council members' evidence suggested affirmatively that they had implemented the indemnification procedure in good faith. That being so, we not only exercised our jurisdiction, but we reversed the district court's denial of summary judgment on the council members' qualified-immunity defense, despite "Smith's conclusory allegations" of bad faith. *Id.*

*Chateaubriand v. Gaspard,* 97 F.3d 1218 (9th Cir.1996), is not to the contrary. In *Chateaubriand,* a former communications coordinator for the state senate's Democratic caucus sued caucus leaders under § 1983, claiming that they had demoted and replaced him because of his First Amendment-protected speech. The historical facts (such as the demotion and the existence of the protected speech) were undisputed, but the caucus leaders' motive was disputed. The district court denied summary judgment to the defendants on their claim of qualified immunity, and we held that we lacked jurisdiction to review the matter of motive. *Id.* at 1223. We did that even in the face of the defendants' argument that there was no evidence, but only an allegation, of bad motive. *Id.*

There are two reasons why *Chateaubriand* does not detract from the *Cunningham* approach. It was not a "mere allega-tions" case, and subsequent Supreme Court cases changed the landscape.

First, notwithstanding the *Chateaubriand* defendants' assertion that there was no evidence of bad motive, in fact there was. The district court had noted that the plaintiff did not merely allege an improper motive; he also had presented facts—his vigorous complaints about illegal campaign practices and the immediately subsequent acts of the defendants in freezing him out and demoting him, for example—that made it a "very close question." *Id.* at 1223.

Second, the intervening Supreme Court decision in *Crawford–El* undercuts the reasoning of *Chateaubriand.*[4] In *Crawford–El,* the Supreme Court held that, with respect to the substance of a qualified-immunity defense, allegations of improper motive must be both specific and nonconclusory. 523 U.S. at 598, 118 S.Ct. 1584. The panel in *Chateaubriand* did not have the advantage of this analogous reasoning when it examined its jurisdiction.

Finally, the Supreme Court's recent decision in *Saucier v. Katz,* 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), underscores our jurisdiction in this case. There, the district court held that the defendant was not entitled to summary judgment on the plaintiff's claim of excessive force, because genuine issues of fact remained on whether the force used to remove the plaintiff from a demonstration and put him into a van was excessive. *Id.* at 2155. We had taken jurisdiction of the defendant's appeal and affirmed on the ground that there was a genuine issue of material fact for trial, because there was a dispute as to what had happened and one version of events showed a violation of a constitution-

---

4. The panel in *Chateaubriand* also appeared to be unaware of the then-recent Supreme Court decision in *Behrens v. Pelletier,* 516 U.S. 299, 116 S.Ct. 834, 133 L.Ed.2d 773 (1996), or, at least, did not analyze its significance. As explained above, in *Behrens* the Court moderated the jurisdictional bar suggested by *Johnson.* 516 U.S. at 312–13, 116 S.Ct. 834.

al right. *Katz v. United States,* 194 F.3d 962, 966–67, 970–71 (9th Cir.1999). We also held that the "reasonableness" prong of the qualified-immunity inquiry and the "reasonableness" prong of the excessive-force claim were identical. *Id.* at 968. In reversing our decision, the Supreme Court made four points that inform our understanding here.

First, the Court held that a defendant is entitled to a ruling on qualified immunity

> early in the proceedings so that the costs and expenses of trial are avoided where the defense is dispositive. Qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation." *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985). The privilege is "an *immunity from suit* rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." *Ibid.* As a result, "we repeatedly have stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Hunter v. Bryant,* 502 U.S. 224, 227, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) (*per curiam* ).

*Saucier,* 121 S.Ct. at 2156 (emphasis in original).

Second, the Court held that the required first step in the analysis is to consider the materials submitted in support of, and in opposition to, summary judgment, in order to decide whether a constitutional right would be violated if all facts are viewed in favor of the party opposing summary judgment:

> A court required to rule upon the qualified immunity issue must consider, then, this threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a con-

stitutional right? This must be the initial inquiry....

> If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity. On the other hand, if a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established.

*Id.* (citation omitted).

Third, the Court emphasized the broad discretion that must be afforded to police officers who face tense situations, and the importance of granting immunity even when officers make mistakes. After discussing *Graham v. Connor,* 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), and the need for "deference to the judgment of reasonable officers on the scene," *id.* at 2158, the Court said:

> An officer might correctly perceive all of the relevant facts but have a mistaken understanding as to whether a particular amount of force is legal in those circumstances. If the officer's mistake as to what the law requires is reasonable, however, the officer is entitled to the immunity defense.

*Id.* The converse also is true:

> Officers can have reasonable, but mistaken, beliefs as to the facts establishing the existence of probable cause or exigent circumstances, for example, and in those situations courts will not hold that they have violated the Constitution.

*Id.*

Fourth, and perhaps most important for the present discussion, the Court chided us for taking a minimalist view of our role in reviewing a ruling on summary judgment:

> The approach the Court of Appeals adopted—to deny summary judgment any time a material issue of fact remains

on the excessive force claim—could undermine the goal of qualified immunity to "avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).

*Id.* at 2156. The Court did not suggest that we lacked jurisdiction to consider the defendant's appeal, but instead held that we deferred too much to the district court's conclusion that an issue of fact precluded summary judgment. Indeed, the Court has instructed us that the defendant "was entitled to qualified immunity" and has returned the case to us to ensure dismissal of the claim. *Id.* at 2160. It is true that motive was not an issue in *Saucier,* but jurisdiction, as ever, was.

█ In summary, we believe that the applicable Ninth Circuit cases, including *Cunningham,* properly analyze the question of jurisdiction in this context. Under those precedents, we conclude that we have jurisdiction to consider whether the district court erred in holding that there is a genuine issue of material fact respecting the motives of defendants Bess and Yerby.

## IV.

█ Government officials enjoy qualified immunity from civil damages unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow,* 457 U.S. at 818, 102 S.Ct. 2727; *see also Behrens,* 516 U.S. at 306, 116 S.Ct. 834 (describing *Harlow*'s standard as one of "objective legal reasonableness"). "A public official is not entitled to qualified immunity when the contours of the allegedly violated right were sufficiently clear that a reasonable official would understand that what he [was] doing violate[d] that right." *Osolinski v. Kane,* 92 F.3d 934,

936 (9th Cir.1996) (alterations in original) (citation and internal quotations omitted). Determining whether a public official is entitled to qualified immunity "requires a two-part inquiry: (1) Was the law governing the state official's conduct clearly established? (2) Under that law could a reasonable state official have believed his conduct was lawful?" *Browning v. Vernon,* 44 F.3d 818, 822 (9th Cir.1995) (citing *Act Up!/Portland v. Bagley,* 988 F.2d 868, 871–72 (9th Cir.1993)). This standard " 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.' " *Hunter v. Bryant,* 502 U.S. 224, 229, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) (per curiam) (quoting *Malley v. Briggs,* 475 U.S. 335, 343, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986)).

### A.

█ The district court correctly determined that the first prong of the qualified-immunity inquiry—whether the law governing Appellants' conduct was clearly established—had been met. The Eighth Amendment protections afforded inmates during violent prison disturbances have been delineated by the Supreme Court on numerous occasions. *See, e.g., Hudson v. McMillian,* 503 U.S. 1, 8, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992); *Whitley,* 475 U.S. at 319, 106 S.Ct. 1078. The court appropriately applied the well-settled principle that, "[a]fter incarceration, only the unnecessary and wanton infliction of pain ... constitutes cruel and unusual punishment." *Id.* (citations and internal quotation marks omitted). Where a prison security measure is undertaken ostensibly for the protection of prison officials and the inmate population, force is deemed legitimate as long as it is applied "in a good faith effort to maintain or restore discipline [and not] maliciously and sadistically for the very

purpose of causing harm." *Id.* at 320–21, 106 S.Ct. 1078.

## B.

 Having determined that the law governing the use of force in prison disturbances is clearly established, the court then proceeded to evaluate the second prong of the qualified-immunity analysis—whether Appellants could have reasonably believed that their conduct was lawful. It denied qualified immunity based on its determination that there was a jury question as to the officers' subjective intent. The district court specifically noted that (1) there were facts from which a jury could find that either Bess or Yerby fired the shot that hit Jeffers; (2) Jeffers submitted sufficient evidence, if it is credited by a jury, to demonstrate that defendants Gomez and White were aware that existing procedures created a substantial risk of serious harm to inmates and that they failed to respond reasonably to that risk; (3) defendants' failures may have contributed to Jeffers' injuries; (4) there were disputed facts concerning the reasons for Bess' failure to warn anyone about the rumor of violence in the yard on the day of the altercation; and (5) Jeffers raised a sufficient inference that Bess' and Yerby's motives may have been discriminatory.

 Although a defendant's subjective intent is not relevant to the qualified-immunity defense, his mental state is relevant where it is an element of the alleged constitutional violation. *See Crawford–El,* 523 U.S. at 589 & n. 11, 118 S.Ct. 1584. As noted earlier, to prevail on the motion for summary judgment, Jeffers must " 'put forward specific, nonconclusory factual allegations' that establish improper motive causing cognizable injury." *Id.* at 598, 118 S.Ct. 1584 (quoting *Siegert,* 500 U.S. at 236, 111 S.Ct. 1789 ( Kennedy, J., concurring in judgment)). Thus Jeffers must allege facts in this case that demonstrate that Appellants shot at Jeffers, or permitted Jeffers to be shot, because of an unconstitutional motive or state of mind.

## 1.

Jeffers makes several allegations that he contends raise an inference that the force used by Bess and Yerby was malicious or sadistic. For example, he notes that Bess' original handwritten incident report states that Bess shot at the shoulder of a Black inmate, and that a typed version prepared on September 30, 1996, three days after the disturbance, states that Bess aimed "at the left side of his body to disable." These two statements are not necessarily inconsistent; the latter simply uses the official language "to disable." Nothing about the change suggests that Jeffers was shot other than in a good-faith attempt to bring the disturbance under control.

Jeffers also refers to a typewritten report presented by Bess on November 14, 1996, six weeks after the incident, that includes a statement that he fired a second warning shot, although his original September 30, 1996 report does not mention this. These circumstances are immaterial because the shot is mentioned in Bess' original handwritten report. Although the word "warning" used to describe this second shot was written in handwriting other than Bess', the writing that is Bess' clearly states that the shot struck the 7 block mini-yard wall. This is consistent with a warning shot. There is no suggestion that this round struck Jeffers; nor does any evidence suggest that the shot was fired in anything other than a good-faith effort to control the disturbance. As to changes in Yerby's incident report, her characterization of her second shot was changed from "for effect" to "warning shot" by someone she could not identify. That change is immaterial because the second shot was

fired twenty minutes into the disturbance, and Jeffers was shot in the first two minutes.

Neither Yerby nor Bess is able to state definitively that they fired the shot that injured Jeffers. Jeffers contends that this failure to "admit" to the shooting is evidence of the shooter's malicious intent. We do not see why Bess' and Yerby's inability to identify who actually fired the shot suggests that it was fired for any reason other than to control the disturbance. In the context of a major disturbance involving 150–200 inmates, where two officers fired in Jeffers' direction at approximately the same time, it is not surprising that neither can state, with certainty, as to whose shot hit Jeffers. The officers' uncertainty does not suggest malice or sadism or otherwise create an inference of impermissible motive.

The district court also denied summary judgment based on its determination that there were disputed issues of material fact as to Jeffers' claim that Bess and Yerby violated Jeffers' Eighth Amendment rights by failing to prevent the other from firing in a malicious manner. For the purpose of determining whether either officer's failure to intervene violated Jeffers' rights, only the officers' conduct during the first ninety seconds of the disturbance is relevant.[5] Yerby testified that, after the disturbance broke out, she and other guards yelled "yard down," and she heard gunfire and saw fights everywhere. Her attention focused on an Hispanic inmate approaching a Black inmate with a knife, and she watched the Hispanic inmate for "[a]bout a minute" before pulling the trigger. She fired at approximately the same time that Bess fired his shot. Understandably, she was focused on the yard at this time, and not on the actions of her colleague. More-

over, she had no reason to suspect that Bess would fire maliciously. Therefore, her failure to prevent Bess from firing does not create an inference of impermissible motive.

Bess' failure to prevent Yerby from firing her weapon also was objectively reasonable and creates no inference of impermissible motive. The undisputed evidence shows that he was scanning the yard, yelling "yard down," and firing shots of his own during the first ninety seconds of the disturbance. There is no evidence that he was aware of any possibility that Yerby was acting in a manner that violated Jeffers' constitutional rights or that he had any opportunity to prevent her conduct.

 According to Jeffers' own account, he was being attacked by an inmate with a knife-like weapon when he was shot. That the bullet struck Jeffers rather than his attacker amounts to negligence or recklessness, at most. According to the District Attorney's Report, even Jeffers believed that he was not shot intentionally. Given the absence of evidence showing that either officer acted purposely to injure Jeffers and the clearly established law that a prison guard is permitted to use deadly force "in a good faith effort to maintain or restore discipline," *Whitley*, 475 U.S. at 320, 106 S.Ct. 1078, both officers' actions in firing their guns in Jeffers' vicinity were neither malicious nor sadistic. They are therefore entitled to summary judgment. The court erred in denying the summary judgment motions predicated on this defense.

## V.

 The court denied summary judgment also on Jeffers' claim that Bess failed

---

5. Thus, it is immaterial that Yerby "waited an entire *20 minutes* before firing her own second shot" and did not intervene to stop Bess during that time. (Emphasis added.)

to act on the rumors of violence because it concluded that there were disputed facts relating to this claim.

■ Because this contention does not target behavior occurring during an ongoing prison security measure, the "deliberate indifference" standard governs. A prison official is deliberately indifferent to a substantial risk of serious harm to inmates if that official is subjectively aware of the risk and does nothing to prevent the resulting harm. *Farmer v. Brennan,* 511 U.S. 825, 828–29, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). Deliberate indifference requires that an official "both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837, 114 S.Ct. 1970. We are not convinced that Bess' behavior met the necessary elements to make out a case of deliberate indifference.

Jeffers has not presented any evidence that permits an inference that Bess had a "sufficiently culpable state of mind" to be guilty of deliberate indifference towards the safety of the inmates. *Id.* at 834, 114 S.Ct. 1970. Prison supervisors were told that Hispanic inmates were planning to attack Black inmates, and Sergeant Baughman, Bess' immediate superior, interviewed the heads of the various inmate factions. Regardless of whether it was prudent for Sergeant Baughman and Captain Walker to order the release of the yard after learning that the Hispanics were planning to attack "one of their own," there is no evidence that Bess should have done anything differently once this decision was made. He kept a close eye on the inmates once they were released and, when trouble began, he immediately shouted "yard down" and fired warning shots. The court erred in denying Bess' summary judgment motion on this claim.

## VI.

■ The court denied summary judgment on Bess and Yerby's motion countering Jeffers' Equal Protection claim, holding that the plaintiff raised a sufficient inference that their motives may have been discriminatory. The denial as to Yerby is moot because Jeffers' amended complaint, filed after the magistrate judge's ruling, alleges that only Bess' actions were racially motivated in violation of the Equal Protection Clause.

The court cited three evidentiary matters which it believed raise an inference of Bess' alleged discriminatory motive: (1) Bess shot at a Black inmate who was making a stabbing motion and at an unarmed Black inmate who was kicking an Hispanic inmate, but only fired warning shots or no shots at all at Hispanic inmates who were making stabbing motions; (2) all but one of the inmates who were shot were Black, and all the inmates who suffered stab wounds serious enough to require medical attention were Black; and (3) some staff members and inmates voiced concerns about the possibility of the racial motives of the officers and the possibility that the Black inmates were "set up."

These facts fall short of alleging that Bess acted with any unconstitutional motive. First, the district court's reliance on the total number of inmates injured is misplaced. Jeffers does not allege that Bess shot any other inmate besides him. Accordingly, the fact that more Black than Hispanic inmates were injured by *others* does not raise an inference that *Bess* acted with a discriminatory motive. Likewise, Jeffers' allegations that unidentified staff members and inmates believed that some correctional officers acted with discriminatory intent do not support the inference that *Bess,* in particular, acted with discriminatory intent. The unarmed Black inmate at whom Bess fired was in a mob of

eight to ten inmates who were kicking two inmates who were on the ground; the record shows no similar situation involving an Hispanic inmate. Jeffers has not made the specific, nonconclusory factual allegations that establish Bess shot at Jeffers with a discriminatory motive. *See Crawford–El*, 523 U.S. at 598, 118 S.Ct. 1584 (internal quotation marks omitted).

Having decided that the court erred in denying all of the summary judgment motions presented by Bess and Yerby, we now turn to the appeals of the former Warden White and the former California Director of Corrections Gomez.

## VII.

The district court denied qualified immunity to Gomez and White, holding that they might be held liable for their part in violating Jeffers' constitutional rights. A prison official violates the Eighth Amendment only when he or she "knows of and disregards an excessive risk to inmate health or safety." *Farmer*, 511 U.S. at 837, 114 S.Ct. 1970. This standard requires that the official be subjectively aware of the risk; it is not enough that the official objectively should have recognized the danger but failed to do so. *Id.* at 838, 114 S.Ct. 1970. "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of harm exists, and he must also draw the inference." *Id.* at 837, 114 S.Ct. 1970.

### A.

Jeffers argues that, as California Director of Corrections, Gomez promulgated and maintained policies regarding the use of lethal force against prison inmates that violated his Eighth Amendment right to be free from cruel and unusual punishment. In order to deny qualified immunity on this basis, the district court was required to find "a policy so deficient that

the policy itself is a repudiation of constitutional rights and is the moving force of the constitutional violation." *Redman v. County of San Diego*, 942 F.2d 1435, 1446 (9th Cir.1991) (en banc) (citations and internal quotation marks omitted). We cannot agree that CDC's policies were so fundamentally flawed.

The district court stated that Director Gomez could be liable under the Eighth Amendment "for enacting a policy which improperly allows the use of deadly force ... if [he was] aware that the policy created a substantial risk of serious harm to inmates and [he] failed to respond reasonably to it." The court then found that triable issues of fact existed as to whether: (1) Director Gomez was aware of an excessive number of inmate shootings in California prisons prior to September 27, 1996; (2) whether correctional officers in California were shooting inmates at an unusually high rate in comparison to the rest of the country; and (3) whether the use-of-force policy in place on September 27, 1996, may have contributed to plaintiff's injuries. Once the court determined that Gomez had knowledge of CDC's rate of inmate violence, it placed virtually no further burden of proof on Jeffers. He was not required to present one iota of evidence to establish how Gomez's actions contributed to his injuries. The absence of even a minimum proof threshold to establish a causal relationship was utterly at odds with the doctrine of qualified immunity.

The undisputed record establishes the constitutional validity of the use-of-force policy designed and implemented by Gomez. Prior to the September 27, 1996 riot at CSP–Sac, Gomez established an internal task force to evaluate the use-of-force policy then in existence. After concluding its review of the policy, the task force recommended, among other things, that less lethal weapons be introduced into the prison

system. On May 19, 1995, in response to Gomez's concern that the use-of-force policy was resulting in the inappropriate use of firearms, CDC revised its policy.

The use-of-force policy at the time of the riot stated that "firearms shall only be used when reasonably necessary to prevent or stop escapes, the taking of hostages, or other circumstances which present an immediate danger of escape, loss of life, great bodily injury, or damage to a substantial amount of valuable property." The policy also provided that officers were to "shoot to disable rather than to kill" when a threat to life or great bodily harm was occurring and that "[f]irearms shall be used as a last resort and only after other resources have been considered and are either exhausted or are determined to be clearly inappropriate." Finally, the revised policy reiterated that firearms were not to be utilized to stop mere fist fights between inmates where there was not danger of death or great bodily harm.

The district court placed great weight on the observation that, at the time of the riot, there had been an excessive number of inmate shootings by prison guards in California prisons system-wide, and that CDC correctional officers were shooting at inmates at unusually high rates as compared to other jurisdictions. Under the district court's analysis, Gomez could be condemned for his knowledge of past prison conditions even where, as is demonstrated by this record, he strove to correct those problems. Under this reading a CDC Director would never prevail on qualified immunity on any claim for an injury in a California prison. The district court's approach requires no proof of objectively wrongful conduct and permits a mere dispute over the most effective policy for curbing inmate injuries to defeat qualified immunity.

The uncontroverted evidence in this case simply does not support the conclusion that CDC's policy regarding the use of force in a prison riot context was constitutionally unsound. Nor did the district court rely on any evidence that CDC's policies, or Gomez's actions in implementing them, were the moving force behind any constitutional violation in this case. Jeffers' own retained expert conceded that the training on CDC's use-of-force policy was "legally sound and consistent with good correctional practice and policies throughout the United States."

### B.

 Jeffers alleged in his second claim for relief ("supervisory liability") that Gomez's failure to "properly train, supervise and/or discipline subordinate custodial personnel with respect to the use of deadly force on inmates at CSP–Sac" resulted in Jeffers' injuries. Generally, supervisory officials are not liable for the actions of subordinates on any theory of vicarious liability under 42 U.S.C. § 1983. *Hansen v. Black,* 885 F.2d 642, 645–46 (9th Cir.1989). A supervisor may be liable under § 1983 only if there exists either " '(1) his or her personal involvement in the constitutional deprivation, *or* (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation.' " *Redman,* 942 F.2d at 1446 (quoting *Hansen,* 885 F.2d at 646 (emphasis added)); *see also Mackinney v. Nielsen,* 69 F.3d 1002, 1008 (9th Cir.1995).

With respect to the training of CDC employees, the district court assumed the following facts: (1) that correctional officers are trained to shoot at "center mass" (the torso area) at stationary targets at distances of fifty to one-hundred yards; (2) that officers were not taught to practice hitting arms or legs; (3) that the use of open-sighted rifles and training to shoot at "center mass" are somehow inconsistent with CDC's "shoot to disable" policy; and (4) that some CDC staff differ in their

views as to the "exact meaning" of "shoot to disable." None of these circumstances, however, supports the conclusion that an inadequacy in CDC's training program led to a deliberate violation by Director Gomez of Jeffers' Eighth Amendment rights.

Because Director Gomez had no direct involvement or direct management responsibility for quelling the riot, his qualified-immunity defense should have been examined within the context of policy-level activities. Instead, the district court concluded that he could be liable under the Eighth Amendment merely for "a failure to appropriately train and supervise in the use of deadly force." The court stated that Jeffers had presented evidence sufficient to create an issue of disputed fact as to "whether correctional officers were properly trained and supervised in the use-of-force and in procedures to notify superiors of a potentially dangerous incident" and "whether the failure of defendants to properly train and supervise correctional officers may have contributed to plaintiff's injuries."

The district court failed to impose any burden on Jeffers to show that Director Gomez conducted himself in a reckless or malicious manner or that his actions were, in fact, deliberate. It also neglected to determine or even to address the CDC's use-of-force policy at the time of the riot or the supervision and training provided to the employees on the use-of-force policy. Instead, the district court sanctioned a public policy review by a jury that could result in personal liability for an official never shown to have acted in violation of clearly established constitutional law.

Accordingly, we conclude that the court erred in not granting Director Gomez's motion for summary judgment.

### C.

■ The court made several errors in its analysis of the charges leveled against

Warden White. It failed to analyze whether federal law clearly established that the warden's reliance on the CDC's Shooting Policy violated Jeffers' rights. In fact, it was the warden's duty to implement this policy, as there was no clearly established law prohibiting its use.

### 1.

The realities of this incident must not be ignored. This was one of the largest prison disturbances in the history of the Department. Numerous varieties of weapons, including many which were potentially lethal, were utilized by inmates during the riot. Inmates and staff were physically attacked, and fourteen people were sent to the hospital for emergency treatment. Sixty people required medical care at the prison clinic.

■ The use of firearms during a prison riot is not unlawful. *See Madrid v. Gomez*, 889 F.Supp. 1146, 1179 (N.D.Cal. 1995). Jeffers has not provided any authority that, absent concrete evidence of potential problems under the existing policy, the warden had a duty to change either his supervising chain of command or statewide training requirements or materials. There is also no indication that, prior to September 1996, California courts had grappled with any law prohibiting prison officials from utilizing statewide training practices required by their supervisors.

### 2.

The court also denied qualified immunity as to Jeffers' claim that Warden White created an unsafe and potentially volatile situation by housing inmates of various races and gang affiliations together in a general population yard. White complied with the statewide housing practice, and he had no affirmative duty to change the policy.

The undisputed facts show the following safety measures at CSP–Sac: each inmate is extensively evaluated for housing placement by the classification committee on a routine basis prior to and during the housing assignment; gang members are removed from the general population setting; inmates of different races or gang histories are assigned to yards with the goal of maintaining a racial or gang-affiliation balance; staff constantly conduct random cell searches and daily walks of the yard looking for weapons; and each inmate is physically searched prior to his release into the yard. Such housing arrangements, which are statewide policy, existed prior to White's becoming the warden. Therefore, qualified immunity should have been denied only if Jeffers could prove that it was clearly established that Warden White should have declined to rely upon this statewide policy. We conclude that White was not subjectively aware of an obvious danger in implementing standard prison safety procedures and that the district court erred, therefore, in denying him qualified immunity.

### 3.

Jeffers produced evidence allegedly supporting the theory that the correctional officers received substandard training. This evidence suggests that the officers were told to "shoot to disable" (i.e., shoot at extremities) in situations involving a threat to life or great bodily harm, but they were nevertheless trained to shoot at center mass. Jeffers also emphasizes that officers were not shown shooting policy demonstration films, despite the availability of these aids.

■ Even if these allegations are taken as true, such deficiencies in training technique are insufficient to establish, even

circumstantially, that a substantial risk of serious harm to inmates was known to defendants Gomez and White. Jeffers' claims must be viewed in light of the Court's admonition to accord prison officials " 'wide-ranging deference in the adoption and execution of policies and practices to further institutional order and security.' " *See Whitley*, 475 U.S. at 321–22, 106 S.Ct. 1078 (quoting *Bell v. Wolfish*, 441 U.S. 520, 547, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979)). This deference applies to conduct during an actual disturbance as well as prophylactic measures to prevent such a disturbance. *See id.* at 322, 106 S.Ct. 1078.

### 4.

In addition, Jeffers asserts that there was (1) an insufficient store of non-lethal weapons in the guard towers; (2) an inadequate emergency action plan at CSP–Sac for dealing with a major disturbance; and (3) an absence of reporting procedures to inform Warden White of rumored disturbances, such as the one that preceded the September 27, 1996 disturbance. As to the mix between non-lethal and lethal weapons, relating to the availability or use thereof, this court is not permitted to micro-manage the selection of weapons to control disturbances of various magnitudes included in the emergency plans. We similarly defer to the CSP–Sac prison officials, who have experience derived from years of observation and practice, as to the appropriateness of their emergency action plans. Finally, the evidence indicates that reporting procedures for informing prison officials of potential disturbances did exist.[6]

### VIII.

■ In *Whitley*, the Court addressed the issue of an official's proper conduct during a prison riot. 475 U.S. at 321, 106 S.Ct. 1078. The Court noted that a prison

---

6. In a sworn declaration, former Warden ⸱White described the policy for responding to

official has a duty to protect prison employees, visitors, and the inmates themselves, and it recognized the difficult balance that this duty may entail. *Id.* at 320, 106 S.Ct. 1078. In light of these complexities, the Court cautioned that " '[p]rison administrators ... should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.' " *Id.* at 321–22, 106 S.Ct. 1078 (quoting *Bell,* 441 U.S. at 547, 99 S.Ct. 1861).

Gomez was not present at CSP–Sac during the disturbance, and therefore he cannot be found to have been acting maliciously or sadistically at the time. There is no basis to describe Warden White's conduct during the disturbance as malicious or sadistic. Jeffers objects that White failed to take immediate command of the prison during the disturbance, as required under CDC policy. Regardless of whether this is a valid criticism, Jeffers has not alleged, nor has he produced any evidence supporting the proposition, that any such failure resulted from malice, sadism, or an intent to cause harm. In sum, the evidence does not indicate any action by Gomez or White during the disturbance that constituted a knowing violation of Jeffers' constitutional rights under *Whitley.* Absent any indication that Gomez or White knowingly or intentionally violated Jeffers' constitutional rights, the court erred in denying them summary judgment on this ground.

\* \* \* \* \*

Accordingly we hold that each of the Appellants was entitled to qualified immunity and the court erred in failing to grant summary judgment on their motions. We reverse the judgment of the district court and remand with a direction to enter judgment in favor of Appellants.

REVERSED and REMANDED.

---

rumors of inmate violence:

When information such as rumors regarding inmate violence is received by staff, this information goes through the chain of command within the housing units. Depending upon the reliability of the information, it may be further investigated by housing staff or by the Investigative Services Unit. Generalized, unverified rumors are received on a daily basis. I do not expect my Captains to bring this information to my attention when it is of such a nature.

When the information is verified, depending upon the extent of the information, as to whether it involves a few inmates or numerous inmates, it will be brought to the attention of administrative staff such as the Associate Wardens, the Chief Deputy Warden and myself. Furthermore, when I would visit the housing units, I would speak directly to staff who would often inform me of certain situations and brief me regarding the investigative process.