Carlos ROSADO, Plaintiff,

v.

Edward ALAMEIDA, Jr.,
et al., Defendants.

No. CIV.03CV1110J(LSP).

United States District Court,
S.D. California.

June 14, 2007.

Aaron P. Arnzen and Darcie A. Tilly, Cooley Godward Kronish LLP, San Diego, CA, for Plaintiff.

Karen Walter, General's Office, San Diego, CA, for Defendants.

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [Doc. No. 165.]**

JONES, District Judge.

Before the Court is Defendants' Motion for Summary Judgment ("Motion") as to all claims in Plaintiff Olga Rosado's ("Plaintiff") Complaint. [Doc. No. 165.] Plaintiff filed an Opposition to the Motion for Summary Judgment ("Opposition"), and Defendants filed a Reply to the Opposition ("Reply"). [Doc. Nos. 175, 181.] Pursuant to Civil Local Rule 7.1(d)(1), the Court decides the matter on the pleadings submitted and without oral argument. *See* S.D. Cal. Civ. Rule 7.1(d)(1). For the reasons set forth below, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' Motion for Summary Judgment.

### Background Facts

The following facts are either stipulated, supported by affidavit or deposition testimony, uncontroverted, or viewed in the light most favorable to Plaintiff, the non-moving party. The Court excludes factual assertions that are immaterial or that are conclusions of law rather than statements of fact.

Carlos Rosado ("Rosado") was an inmate committed to the custody of the California Department of Corrections ("CDC"), and the events giving rise to the causes of action herein occurred when Rosado was housed at Centinela State Prison ("Centinela"). (*See* Compl. at ¶ 6.) Rosado was received at Centinela on March 20, 2000. (*See* Ex. D, C. Pickett Decl. at ¶ 6.) At that time, Defendant Charles Pickett, D.O. ("C.Pickett") was the Chief Medical Officer and Health Care Manager at Centinela, where his duties consisted of coordinating health care needs for the inmates, including reviewing requests for various consultants to provide medical care to Rosado. (*See* Ex. D, C. Pickett Decl. at ¶¶ 5, 8.) Defendant John Parsons, M.D. ("Parsons") was the Chief Physician at Centinela and provided regular medical care and treatment to Rosado from September 2000 to August 2004. (*See* Ex. F, Parsons Decl. at ¶¶ 3, 5, 10, 15, 23, 29, 46, 85.) Defendant D. Thornton, M.D. ("Thornton") was a Staff Physician at Centinela and provided medical care and treatment to Rosado on several occasions. (*See* Ex. G, Thornton Decl. at ¶¶ 4, 6, 8.) From July 1, 2000 to the present, Defendant Ragheb Sawires, M.D. ("Sawires") has been the Utilization Management Physician Consultant to the CDC and Rehabilitation Health Care Services Committee. (*See* Ex. H, Sawires Decl. at ¶ 3.) As a member of the Health Care Review Committee ("HCRC"), which was responsible for approving transplant evaluation requests, he reviewed documents provided by Parsons regarding Ro-sado's request for liver transplant evaluation. (*See id.* at ¶¶ 4, 7.) Plaintiff also alleges that Defendant William Smith, M.D. had responsibility for the medical care of Rosado. (*See* Compl. at ¶ 12.) However, on July 10, 2006, Defendants filed a Statement of Fact of Death of Defendant Smith, and to date, Plaintiff has not filed a motion to substitute. [Doc. No. 163.]

Defendant Edward Alameida, Jr. ("Alameida") was the Director of CDC from June 2002 to January 5, 2004 and did not have input into or review medical decisions regarding inmates in the custody of the CDC. (*See* Ex. A, Alameida Decl. at ¶¶ 1–2.) Defendant George Giurbino ("Giurbino") was the Warden at Centinela and did not participate in the medical care and treatment of Rosado. (*See* Ex. I, Giurbino Decl. at ¶ 4.) From December 2001 to February 2003, Defendant Michael Pickett ("M.Pickett") was the Deputy Director, Health Care Services Division ("HCSD"), of the CDC and was not involved in the evaluation of Rosado's transplant request. (*See* Ex. B, M. Pickett Decl. at ¶¶ 1, 7.) From December 1997 through October 26, 2001, Defendant Susan Steinberg, M.D. ("Steinberg") was the Deputy Director of HCSD and from October 26, 2001, to February 28, 2002, she was the Chief Medical Officer of Medical/Dental. (*See* Ex. C, Steinberg Decl. at ¶¶ 4–5.)

Soon after his transfer to Centinela, Rosado began complaining of abdominal pain and on June 7, 2000, Rosado informed physicians at Centinela that he had a "bad liver." (*See* Compl. ¶ 17; Pl.'s Ex. B at AGO–107.) On August 16, 2000, Rosado was diagnosed as having "advanced liver disease," likely arising from Hepatitis C and a past drinking problem. (*See* Pl.'s Ex. B at AGO–261, 138.) On September 7, 2000, Centinela medical records indicate Rosado received treatment at the Centine-

la Gastroenterology Clinic by Mostafa Hamdy, M.D. ("Hamdy"), who confirmed that Rosado had "chronic Hepatitis C[and] liver cirrhosis." (*See* Pl.'s Ex. B at AGO–098.) Rosado received several other examinations over the course of the subsequent few months, including a urology consultation, sonogram, endoscopy, esophagogastroduodenoscopy with biopsy, CT scan, physicals, and numerous blood tests. (*See, e.g.,* Pl.'s Ex. B at AGO–093, 221–22, 244–45, 282, 299–300, 372, 383–84.) Rosado's condition was labeled as "end-stage liver disease" on or about November 15, 2000. (*See* Pl.'s Ex. B at AGO–027, 091, 093.)

Rosado's treating physicians concluded that he needed a liver transplant in order to survive. On August 16, 2001, Hamdy noted in Rosado's medical records that Rosado had "about a 50% chance of dying in the next 5 years" and that "advanced liver cirrhosis is non-curable without a liver transplant." (Pl.'s Ex. B at AGO–1587, 005) (Parsons noted that Rosado's condition, advanced liver cirrhosis, would prove fatal.) After his physicians informed Rosado about his condition, he began requesting a transplant. (*See, e.g.,* Pl.'s Ex. B at AGO–065.) Plaintiff alleges that his repeated requests were consistently rejected by Pickett, usually through Parsons, because Pickett was of the view that inmates do not qualify for transplants. (*See* Pl.'s Opp'n at 4.)

On January 28, 2002, Parsons noted in Rosado's medical records that he should be evaluated by the Utilization Review Committee at HCSD as a potential candidate for a liver transplant. (*See* Ex. F, Parsons Decl. at ¶ 27; Pl.'s Ex. B at AGO–518.) On July 16, 2002, Parsons wrote to C. Pickett and requested permission to forward Rosado's transplant request to HCRC. (*See* Pl.'s Ex. F, Sawires Dep., Ex. 2 at 2.) C. Pickett approved Parsons' request to forward the July 16th transplant request memorandum to the Utilization Management Review Committee at HCSD. (*See* Ex. F, Parsons Decl. at ¶ 31.) However, Plaintiff alleges that the documents were not forwarded to HCSD at that time, and that, upon discovering this, Parsons himself forwarded the documents several months later. (*See id.;* Pl.'s Ex. F, Sawires Dep., Ex. 2 at 1.) HCRC approved the request on January 28, 2003. (*See* Ex. H, Sawires Decl. at ¶ 8; Ex. F, Parsons Decl. at ¶ 44.) On April 4, 2003, Rosado was evaluated for a liver transplant at UCLA Medical Center by Sammy Saab, M.D. ("Saab"). (*See* Ex. F, Parsons Decl. at ¶ 50; Pl.'s Ex. B at AGO–1611–12.) In a letter to Parsons dated September 29, 2003, Saab wrote that UCLA did not have the facilities to care for an inmate at the moment and that Parsons should consider an alternate liver transplant center that might have the proper security. (Pl.'s Ex. B at AGO–1647.)

On January 13, 2004, Rosado was evaluated at UCSF for liver transplant candidacy. (*See* Parsons Decl. at ¶ 75; Pl.'s Ex. B at AGO–1652.) Medical reports prepared by the UCSF transplant doctors indicate that toxicology screens performed on August 16, 2002, September 27, 2002, and January 12, 2004 were each positive for THC. (*See* Pl.'s Ex. B at AGO–1654). In a letter to Parsons dated January 13, 2004, the UCSF doctors agreed by consensus to defer consideration of Rosado for listing at this institution. (*Id.*) The UCSF doctor recommended that Rosado discontinue use of illicit drugs, including THC, and stated that Nathan M. Bass, M.D. ("Bass"), Medical Director of Liver Transplantation at UCSF, would send a separate letter to the medical officer in charge at Centinela with regard to the "specific request from this institution to determine whether an incarcerated individual ... could potentially become a candidate for liver transplantation at UCSF." (*Id.* at 1654–55.)

On September 3, 2004, Rosado moved for a preliminary injunction ordering Defendants to take specific and tangible steps toward getting Rosado a fair transplant evaluation. [Doc. No. 57.] On December 8, 2004, this Court granted the motion in part, and ordered Defendants to contact ten transplant centers in California to determine if they would accept prisoners, and arrange for Rosado to receive transplant evaluations at two facilities. (*See* Order Granting in Part Pl.'s Mot. for Prelim. Inj. at 13.) Twenty-two days later, on December 30, 2004, C. Pickett instructed Centinela Utilization Management Nurse, Nirvana Esqueda ("Esqueda"), to send letters to ten California medical centers via certified mail requesting that each medical center respond in writing by January 7, 2005 as to whether each institution would consider Rosado as a liver transplant candidate. (*See* Ex. D, C. Pickett Decl. at ¶ 25.) Esqueda continued to contact the ten medical centers until March 25, 2005, when Rosado passed away at Corcoran State Prison Hospital. (*Id.* at ¶ 26.)

In her Complaint, Plaintiff alleges that Defendants were deliberately indifferent to Rosado's serious medical needs in violation of the Eighth Amendment. (*See* Compl. at 2.) Plaintiff also alleges that Defendants were negligent in administering Rosado's medical care and are also liable for negligent infliction of emotional distress. (*See id.*) Before the Court is Defendants' Motion for Summary Judgment as to Plaintiffs' Eighth Amendment and negligence claims.[1] [Doc. No. 165.]

### *Legal Standard*

Summary judgment is appropriate under Rule 56 of the Federal Rules of Civil Procedure on "all or any part" of a claim where there is an absence of a genuine issue of material fact and the moving party is entitled to judgment as a matter of law.

Fed.R.Civ.P. 56(a) & (c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). One of the principal purposes of Rule 56 is to dispose of factually unsupported claims or defenses. *See Celotex*, 477 U.S. at 323–24, 106 S.Ct. 2548. A fact is material when, under the governing substantive law, the fact might affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see also Freeman v. Arpaio*, 125 F.3d 732, 735 (9th Cir.1997). A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. When making its determination, the Court must view all inferences drawn from the underlying facts in the light most favorable to the party opposing the motion. *See Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

The party seeking summary judgment bears the initial burden of establishing the absence of a genuine issue of material fact. *See Celotex*, 477 U.S. at 323, 106 S.Ct. 2548. The moving party can satisfy this burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element to that party's case on which that party will bear the burden of proof at trial. *See id.* at 322–23, 106 S.Ct. 2548. If the moving party fails to discharge this initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence. *See Adickes v. S.H. Kress & Co.*,

---

1. While Defendants bring this Motion as to all of Plaintiff's claims, Defendants make no mention of Plaintiff's claim of negligent infliction of emotional distress within their Motion.

398 U.S. 144, 159–60, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).

If the moving party meets the initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson,* 477 U.S. at 256, 106 S.Ct. 2505. "The mere existence of a scintilla of evidence in support of the nonmoving party's position is not sufficient." *Triton Energy Corp. v. Square D. Co.,* 68 F.3d 1216, 1221 (9th Cir.1995) (citing *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505); *see also Matsushita,* 475 U.S. at 586, 106 S.Ct. 1348 (if the moving party meets this initial burden, the nonmoving party cannot defeat summary judgment by merely demonstrating "that there is some metaphysical doubt as to the material facts"). It is insufficient for the party opposing summary judgment to "rest upon the mere allegations or denials of [her] pleading." Fed.R.Civ.P. 56(3). Rather, the party opposing summary judgment must "by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 56(e)). Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." *See T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir.1987). In addition, the Court is not obligated "to scour the records in search of a genuine issue of triable fact." *Keenan v. Allan,* 91 F.3d 1275, 1279 (9th Cir.1996) (citing *Richards v. Combined Ins. Co.,* 55 F.3d 247, 251 (7th Cir.1995)). "[T]he district court may limit its review to the documents submitted for the purposes of summary judgment and those parts of the record specifically referenced therein." *Carmen v. San Francisco Unified School Dist.,* 237 F.3d 1026, 1030 (9th Cir.2001).

"Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348 (citing *First Nat'l Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 289, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)). Moreover, "[a] district court must enter summary judgment against a party who fails to make a showing sufficient to establish an essential element of a claim, even if genuine factual disputes exist regarding other elements of the claim." *Cunningham v. City of Wenatchee,* 214 F.Supp.2d 1103, 1110 (E.D.Wash.2002) (citing *Celotex,* 477 U.S. at 323–24, 106 S.Ct. 2548).

### *Discussion*

### I. *Action Against Defendant Smith is Dismissed for Failure to Substitute*

Defendants argue that Plaintiff's claims against Defendant Smith should be dismissed pursuant to Federal Rule of Civil Procedure 25(a)(1) due to Plaintiff's failure to file a motion for substitution. Rule 25(a)(1) provides that "[u]nless the motion for substitution is made not later than 90 days after the death is suggested upon the record by service of a statement of the fact of the death as provided herein for the service of the motion, the action shall be dismissed as to the deceased party." Fed. R.Civ.P. 25(a)(1). Here, Defendants filed a Statement of Fact of Death as to Defendant Smith indicating that Smith died on January 5, 2006. [Doc. No. 163.] Plaintiff has not objected to Defendants' Motion to Dismiss Defendant Smith. Finding that Plaintiff has not filed a motion for substitution and that the ninety-day period provided by Rule 25(a)(1) has now elapsed, the Court **DISMISSES** the action against Defendant Smith. Additionally, Plaintiff has failed to address any of the claims against Defendant Smith in her Opposition

to Defendants' Motion for Summary Judgment.

## II. *Eighth Amendment Violation*

Defendants move for summary judgment on Plaintiff's claim that Defendants failed to provide Rosado with adequate medical care in violation of the Eighth Amendment. (*See* Defs.' Mem. Supp. Mot. for Summ. J. at 1.) Defendants argue that Plaintiff cannot make a showing sufficient to establish that Defendants were deliberately indifferent to Rosado's medical needs because he received extensive medical attention and was taken for transplant evaluations at two major academic medical centers. (*See* Defs.' Mem. Supp. Mot. for Summ. J. at 1.) Plaintiff counters that Defendant C. Pickett's refused and then delayed efforts to have Rosado evaluated for, and ultimately placed on a list for, a liver transplant, demonstrating deliberate indifference to his serious medical condition. (*See* Pl.'s Opp'n at 1–2, 10.)

Prisoners can establish an Eighth Amendment violation with respect to medical care and treatment if they can prove there has been "deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). To state a claim, the prisoner must prove that he was confined under conditions posing a risk of "objectively serious harm" and that prison officials had a "sufficiently culpable state of mind" in denying him proper medical care. *Wallis v. Baldwin,* 70 F.3d 1074, 1076 (9th Cir.1995) (internal quotations omitted). In other words, the relevant inquiry involves both an objective and a subjective component. *Clement v. Gomez,* 298 F.3d 898, 904 (9th Cir.2002). For the reasons set forth below, the Court **DENIES IN PART** and **GRANTS IN PART** Defendants' Motion for Summary Judgment.

### A. *Summary Judgment is Denied as to Plaintiff's Eighth Amendment Claim Against Defendant C. Pickett*

In order to establish the objective component of an Eighth Amendment claim based on deliberate indifference to serious medical needs, a plaintiff must demonstrate his medical need was sufficiently "serious" such that the failure to treat the prisoner's condition could have resulted in further significant injury or the "unnecessary and wanton infliction of pain." *Estelle,* 429 U.S. at 104, 97 S.Ct. 285; *Clement,* 298 F.3d at 904. For example, the "existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain are ... indications that a prisoner has a 'serious' need for medical treatment." *McGuckin v. Smith,* 974 F.2d 1050, 1059–60 (9th Cir. 1992), *overruled on other grounds by WMX Technologies, Inc. v. Miller,* 104 F.3d 1133 (9th Cir.1997).

Here, undisputed facts indicate that Plaintiff has satisfied the objective component of an Eighth Amendment claim. Evidence presented by both parties indicates that Rosado was diagnosed with end stage liver cirrhosis and his condition was serious and potentially life-threatening. (*See* Pl.'s Ex. B at AGO–005, 1587; Ex. E, C. Pickett Dep. at 85:16–19.) The only issue to be resolved is whether Plaintiff has provided evidence from which it reasonably can be inferred that Defendants acted with a sufficiently culpable state of mind.

The subjective component requires the prisoner to identify sufficient facts to indicate that prison officials acted with a culpable state of mind. *See Wilson v. Seiter,* 501 U.S. 294, 299, 111 S.Ct. 2321,

115 L.Ed.2d 271 (1991). A prison official is "deliberately indifferent" if he knows that a prisoner faces a substantial risk of serious harm and disregards that risk by failing to take reasonable steps to abate it. *Farmer v. Brennan*, 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). The indifference to an inmate's medical needs must also be substantial; inadequate treatment due to inadvertence, malpractice, or even gross negligence, does not amount to a constitutional violation. *See Estelle*, 429 U.S. at 104, 97 S.Ct. 285; *Wood v. Housewright*, 900 F.2d 1332, 1334 (9th Cir.1990). To successfully allege "deliberate indifference" the allegations must amount to "something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Farmer*, 511 U.S. at 835, 114 S.Ct. 1970 (discussing *Estelle*, 429 U.S. at 97, 97 S.Ct. 285).

A difference of medical opinion as to the need to pursue one course of treatment over another is insufficient, as a matter of law, to establish deliberate indifference. *See Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir.1989). Moreover, a mere delay in medical treatment, absent a showing of resulting substantial harm, is insufficient to support an Eighth Amendment violation. *Shapley v. Nevada Bd. of State Prison Comm'rs*, 766 F.2d 404, 407 (9th Cir.1985). Plaintiff "must show that the course of treatment the doctors chose was medically unacceptable under the circumstances and . . . that they chose this course in conscious disregard of an excessive risk to plaintiff's health." *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir.1996) (citations omitted).

For example, in *Jackson*, a state prisoner filed a Section 1983 claim stating that prison officials refused to provide him with a kidney transplant. *See id.* In dismissing an interlocutory appeal, the Court of Appeals for the Ninth Circuit noted:

[The prisoner] has alleged the doctors chose to deny him the opportunity for a kidney transplant not because of an honest medical judgment, but on account of personal animosity. If [the prisoner] proves that claim at trial, and he has shown that the delay in performing the kidney transplant was medically unacceptable, he will have shown that the doctors were deliberately indifferent to his serious medical needs.

*Id.*

Here, Defendants argue that Rosado's Centinela medical records indicate that he received substantial medical care and treatment for his liver condition from various staff physicians, including Defendants Parsons and Thornton, while he was an inmate at Centinela from March 2000 to January 20, 2005. (*See* Defs.' Mot. at 7.) Records indicate that Rosado received medical care, consultation, and medical procedures from various outside specialists. (*See, e.g.*, Pl.'s Ex. B at AGO–093, 221–22, 244–45, 282, 299–300, 372, 383–84.) Further, Rosado was taken to two outside medical centers for liver transplantation evaluations in April 2003 and January 2004. (*See* Ex. F., Parsons Decl. at ¶¶ 18, 50; Pl.'s Ex. B at AGO–1611–12, 1652.)

However, Plaintiff presents medical records, declarations, and deposition testimony tending to refute Defendants' assertion and demonstrate that Defendant C. Pickett chose to delay Rosado's evaluation for a liver transplant, a course of treatment that "was medically unacceptable under the circumstances, and . . . that [he] chose this course in conscious disregard of an excessive risk to plaintiff's health." *Jackson*, 90 F.3d 330, 332. For the reasons discussed below, the Court FINDS that there are genuine issues of material fact regarding whether C. Pickett's decision to delay Rosado's evaluation for a liver transplant was medically unacceptable and chosen in con-

scious disregard of an excessive risk to Rosado's health.

### 1. C. Pickett Knew About Plaintiff's Serious Medical Condition

In this case, Defendants do not deny the fact that Rosado's condition was indeed serious and that C. Pickett was aware of this. Evidence of Rosado's medical condition can be found throughout his medical records. (*See, e.g.,* Pl.'s Ex. B at AGO–107 ("Cirrhosis of liver"), 138 (chronic Hepatitis C), 1587 ("[A]dvanced liver cirrhosis is non-curable disease without liver transplant.").) C. Pickett testified at his deposition that he was aware that a liver transplant was the only curative measure for Rosado's advanced liver disease. (*See* Pl.'s Ex. E, C. Pickett Dep. at 21:6–16, 85:16–19.)

### 2. A Genuine Issue of Material Fact Remains as to Whether C. Pickett Refused and Delayed Efforts to Refer Rosado for a Transplant Evaluation

Defendants argue that evidence establishes that there is no genuine issue of material fact regarding whether C. Pickett delayed or obstructed Rosado from obtaining a liver transplant evaluation. (*See* Defs.' Reply at 1–2.) In particular, Defendants submitted a declaration from Dr. Parsons indicating that C. Pickett approved Parsons's memorandum requesting that HCSD review Rosado's request for a liver transplant evaluation on July 16, 2002. (Ex. F, Parsons Decl. at ¶ 31.) Defendants point out that, as Plaintiff admits, in January 2003, HCSD approved Rosado's request for a liver transplant evaluation and in April 2003, Rosado was evaluated at UCLA. (Ex. M, Saab Dep., 36:18–37:8.) Defendants also state that Centinela staff contacted UCSF for a liver transplant evaluation, which took place in January 2004. (Pl.'s Ex. B at AGO–1649; Parsons Decl. at ¶ 64, 75.)

Although Plaintiff does not deny that C. Pickett approved Parsons's memorandum requesting that HCSD review Rosado's liver transplant request on July 16, 2002, Plaintiff sets forth evidence to show that C. Pickett significantly delayed the referral of Rosado's request to HCSD. Despite Parsons' physician order on January 28, 2002 that Rosado be evaluated by the Utilization Review Committee at HCSD as a potential candidate for a liver transplant, Plaintiff argues that no action was taken until almost seven months later on July 16, 2002, when Parsons wrote a letter to C. Pickett requesting permission to forward Rosado's transplant request to HCRC. (*See* Ex. F, Parsons Decl. at ¶ 27; Pl.'s Ex. B at AGO–518; Pl.'s Ex. F, Sawires Dep., Ex. 2 at 2.) Parsons wrote "[i]f you choose not to forward this letter then sitting on his liver transplant request is your responsibility, not mine. I have done all that I can do to wrestle with the issue. I strongly suspect that this case will go to court and that your actions and/or inactions may be scrutinized." (Pl.'s Ex. F, Sawires Dep., Ex. 2 at 2.) Plaintiff claims that it was only after receiving this letter that C. Pickett finally approved Parsons' request to forward the July 16th transplant request memorandum to the Utilization Management Review Committee at HCSD. (*See* Parsons Decl. at ¶ 31.)

Defendants argue that C. Pickett did not block evaluation of Rosado by advising Parsons to tell Rosado that he could not get a transplant because he was incarcerated. (Defs.' Reply to Pl.'s Opp. at 2–3.) Defendants cite to Rosado's medical records wherein Parsons writes that he is unaware of any liver transplant centers that will take inmates and that it is his impression that incarceration prohibits liver transplant. (Ex. J at AGO–065.) Defendants state that when Parsons makes such statements, there is no reference to

C. Pickett. (Defs.' Reply to Pl.'s Opp. at 2–3.)

However, Plaintiff submitted evidence in support of the conclusion that C. Pickett did in fact inform Parsons of a policy against granting transplants for inmates. When asked at his deposition why he told Rosado on September 10, 2001 that incarceration prohibits liver transplant, Parsons stated that C. Pickett gave him that information. (*See* Pl.'s Ex. C, Parsons Dep., 75:14–17 ("I discussed with CMO Dr. Pickett that the inmate was requesting a liver transplant. And I questioned him as to the feasibility of this, and he reported to me that they were not done"); 82:1–4 (In response to the question of whether major organ transplants were being authorized, Parson states that C. Pickett's answer was "on multiple occasions . . . 'No. This is not being authorized.' ").) However, C. Pickett has stated that he was at all times unaware of any CDC policy that precluded an inmate from receiving an organ transplant. (*See* Ex. D, C. Pickett Decl. ¶ 29.)

In addition, Plaintiff submitted deposition testimony to show that C. Pickett was personally against giving inmates transplants. (*See* Pl.'s Ex. E, C. Pickett Dep., 106:9–11 ("Q: Do you have any reservations about giving an inmate a liver transplant or new liver? A: Yes . . . My opinion is, if we started giving one to everyone who needs it, it would almost bankrupt the state of California, which is already bankrupt. If I had a sister who had the same criteria as Mr. Rosado, I would have to choose my sister, or my mom or someone in my family that I'm close to."), 106:16–18 ("I have a problem with these guys having years and years of criminality and abuse, all of a sudden wants the state of California to come and fix them").) Therefore, a genuine issue of material fact remains as to whether C. Pickett deliberately refused and delayed efforts to refer Rosado for a transplant evaluation despite knowing the risks to Rosado's health.

### 3. A Genuine Issue of Material Fact Remains as to Whether the Treatment Rosado Received was Medically Unacceptable

Plaintiff alleges that the denial and delay in referring Rosado for a transplant evaluation was medically unacceptable. (*See* Pl.'s Opp'n at 14.) Defendants argue that Rosado received excellent and continuous medical care from staff physicians and specialists. (*See* Defs.' Mem. Supp. Mot. For Summ. J. at 1.) As described above, Defendants present evidence to suggest that their treatment of Rosado was medically acceptable because they provided him regular medical treatment and arranged for transplant evaluations at two different hospitals. Further, Defendants argue that Rosado was not placed on an organ donor list because he would not have been eligible for a transplant. Defendants argue that the ability to comply with medical orders is essential for eligibility and that Rosado had a history of noncompliance. Defendants allege that Rosado repeatedly refused, against his doctors' orders, to be admitted to the Centinela infirmary or transferred to another institution with an acute care hospital betterequipped to treat his condition. (*See* Pl.'s Ex. B at AGO–261; Ex. D, C. Pickett Decl. at ¶ 9; Ex. F, Parsons Decl. at ¶¶ 9, 18.) Defendants further allege that Rosado tested positive for illicit drug usage on multiple occasions within one year of his evaluation at UCSF, thus allegedly making him ineligible for placement on a transplant list there and at all other California transplant facilities. (*See* Ex. D, C. Pickett. Decl. ¶ 20.)

Plaintiff, however, argues that Rosado would have been eligible for placement on a transplant list, thus making C. Pickett's denial and delay of a transplant evaluation medically unacceptable. (Pl's Opp'n at 14.)

Plaintiff argues that the only reason UCLA declined Rosado's request was for security reasons and that the reviewing doctors there acknowledged the fact that Rosado needed a transplant. (*See id.* at 14–15; Pl.'s Ex. I, Saab Dep. 41:10–41:20 (To the best of his knowledge it was a "facility related decision"), Sawires Dep. 60:13–23 ( [UCLA] said, "no, we would not do it. Not because he is not a candidate. They said he is a candidate. But we don't have the feasibility ....").) Plaintiff refutes Defendants' assertion that Rosado was noncompliant in refusing to go the Centinela infirmary by presenting evidence to demonstrate that Rosado often checked himself into the infirmary throughout his incarceration. (*See* Pl.'s Ex. B at AGO–074, 097, 328, 345, 347, 366, 369.) Dr. Parsons also testified that Rosado had "aggressively pursued the liver transplant objective such that I think that ... there is a significant chance that he would do what it takes to be successful." (Pl.'s Ex. C, Parsons Dep. 196:19–25.)

In response to Defendants' assertion that Rosado was noncompliant in refusing to be transferred to another facility, Plaintiff presented evidence to show that Rosado requested a transfer to a prison located near his family and support network. (*See* Pl.'s Ex. B at AGO–095, 511, 887, 896.) Lastly, in response to Defendants' assertion that Rosado's illicit drug use would have deemed him ineligible for a transplant, Plaintiff offered testimony and summary chart of the standards of various transplant facilities to show that marijuana use does not automatically disqualify a candidate and that the standards vary by

facility. (*See* Ex. C, Parsons Dep., 46:1–13; Pl.'s Opp'n at 18–20.) In fact, C. Pickett admitted at deposition that he did not possess personal knowledge about the transplant requirements for other facilities. (*See* Pl.'s Ex. E, C. Pickett Dep., 95:17–22.) As the foregoing demonstrates, a genuine issue of material fact remains as to whether Rosado would have been eligible for a transplant and thus whether the medical care, or lack of medical care, provided to Rosado was medically unacceptable.

Accordingly, Defendants' Motion for Summary Judgment **IS DENIED** as to Defendant C. Pickett on the ground that Plaintiff raised genuine issues of material fact on her Eighth Amendment claim of deliberate indifference to a serious medical need.

### B. *Summary Judgment is Granted as to Plaintiff's Eighth Amendment Claims Against all other Defendants*

 In her Complaint, Plaintiff alleges that Defendants Alameida, M. Pickett, Steinberg, Sawires and Giurbino were deliberately indifferent to Rosado's serious medical needs because they were responsible for CDC policies, procedures, and practices, including the alleged policy prohibiting transplants for inmates. (Compl.¶¶ 8–10, 15–16, 32, 56.) In their Motion for Summary Judgment, Defendants provide declarations stating that these Defendants did not provide care and treatment to Rosado nor were they aware of or had control over any policy prohibiting inmate transplants.[2] (*See* Defs.' Mem. Supp. Mot. for

---

2. Defendants are reminded that "the district court may limit its review to the documents submitted for the purposes of summary judgment and those parts of the record specifically referenced therein." *Carmen v. San Francisco Unified Sch. Dist.,* 237 F.3d 1026, 1030 (9th Cir.2001). "[W]hen a party relies on deposition testimony in a summary judgment

motion without citing to page and line numbers, the trial court may in its discretion exclude the evidence." *Orr v. Bank of Am.,* 285 F.3d 764, 775 (9th Cir.2002) (excluding deposition testimony based on the failure to cite the page and line numbers when referring to the deposition). Accordingly,

Summ. J. at 3–5; Ex. A, Alameida Decl.; Ex. B, M. Pickett Decl.; Ex. C, Steinberg Decl.; Ex. H, Sawires Decl.; Ex. I, Giurbino Decl.) However, Plaintiff failed to provide evidence to the contrary. In fact, Plaintiff, herself, provides testimony to show that policies were in fact in place authorizing transplants for inmates. (*See* Pl.'s Opp'n at 12–13; Pl.'s Ex. H, Kana Dep. at 17:13–18:11.)

Plaintiff further alleges that Defendants Parsons and Thornton were responsible for administering medical care to Rosado and were deliberately indifferent to Rosado's serious medical needs in their failure to fulfill their roles adequately and appropriately. (Compl. at ¶¶ 12–14, 32.) In their Motion for Summary Judgment, Defendants set forth declarations indicating that the care and treatment provided by these Defendants were adequate and appropriate. (*See* Defs.' Mem. Supp. Mot. for Summ. J. at 2–6; Ex. F, Parsons Decl.; Ex. G, Thornton Decl.) In her Opposition, Plaintiff refers only to C. Pickett when discussing the refusal and delay of medical care to Rosado and fails to present evidence in support of her claims against the other health care Defendants. (*See* Pl.'s Opp'n at 1–2.)

For the foregoing reasons, Defendants' Motion for Summary Judgment on Plaintiff's Eighth Amendment claims is **DENIED** as to Defendant C. Pickett and **GRANTED** as to all other Defendants.

### III. *Qualified Immunity*

 Defendants move for summary judgment on Plaintiff's Eighth Amendment claims on the alternate ground that they are entitled to qualified immunity. (*See* Defs.' Mem. Supp. Mot. Summ. J. at 11.) Qualified immunity "is an immunity from suit rather than a mere defense to liability." *Mitchell v. Forsyth,* 472 U.S.

511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985). The defense of "qualified immunity" protects "government officials . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). This standard " 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.' " *Hunter v. Bryant,* 502 U.S. 224, 229, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) (per curiam) (quoting *Malley v. Briggs,* 475 U.S. 335, 343, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986)); *Jeffers v. Gomez,* 267 F.3d 895, 909 (9th Cir.2001); *Saucier v. Katz,* 533 U.S. 194, 205, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001) ("The concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct.").

 To resolve the issue of qualified immunity, the Court must make two determinations: (1) whether the facts taken in the light most favorable to the party asserting injury show that the official's conduct violated a constitutional right; and (2) whether the right was "clearly established" so that a "reasonable official would understand that what he is doing violates that right." *Saucier,* 533 U.S. at 201–02, 121 S.Ct. 2151; *Clement v. Gomez,* 298 F.3d 898 (9th Cir.2002).

### A. *Violation of a Constitutional Right*

 Under *Saucier,* the district court must first determine whether, "[t]aken in the light most favorable to the party asserting the injury . . . the facts alleged show the officer's conduct violated a con-

" '[j]udges need not paw over the files without assistance from the parties.' " *Id.* (quoting

*Huey v. UPS, Inc.,* 165 F.3d 1084, 1085 (7th Cir.1999)).

stitutional right." *Saucier*, 533 U.S. at 201, 121 S.Ct. 2151; *Jackson v. City of Bremerton*, 268 F.3d 646, 650 (9th Cir. 2001). "Although a defendant's subjective intent is not relevant to the qualified immunity defense, his mental state is relevant where it is an element of the alleged constitutional violation." *Jeffers*, 267 F.3d at 911 (citing *Crawford–El v. Britton*, 523 U.S. 574, 589, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998)).[3] When a prisoner's cause of action arises under the Eighth Amendment, the defendant's subjective intent comprises an essential element of the affirmative case. *See Wilson v. Seiter*, 501 U.S. 294, 299, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991). Thus, in an Eighth Amendment case like this one, while the court must accept Plaintiff's factual allegations to be true, the assertion of a qualified immunity defense requires him to further " 'put forward specific, nonconclusory factual allegations' that establish improper motive." *Crawford–El*, 523 U.S. at 598, 118 S.Ct. 1584 (quoting *Siegert v. Gilley*, 500 U.S. 226, 236, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991) (Kennedy, J., concurring in judgment)); *see also Jeffers*, 267 F.3d at 911.

As stated above, the Court has found that triable issues of material facts remain with respect to whether C. Pickett acted with deliberate indifference to Plaintiff's serious medical needs in violation of the Eighth Amendment. *See Jeffers*, 267 F.3d at 907; *Saucier*, 533 U.S. at 201, 121 S.Ct. 2151; *Estelle*, 429 U.S. at 104–05, 97 S.Ct.

285. Accordingly, taken in the light most favorable to the Plaintiff, the evidence demonstrates that Defendant C. Pickett violated Rosado's rights under the Eighth Amendment. Thus, Plaintiff has satisfied *Saucier*'s threshold inquiry.

### B. *Whether the Right was Clearly Established*

■ Because the Plaintiff successfully demonstrated that his constitutional right may have been violated, the Court must now determine whether the right was clearly established. *See Saucier*, 533 U.S. at 201, 121 S.Ct. 2151. The second inquiry is whether the contours of a plaintiff's right under the Eighth Amendment were sufficiently clear that a reasonable officer would have understood that the denial or delay of a referral for a transplant evaluation violated that right. *See id.* at 202, 121 S.Ct. 2151. The court must undertake its evaluation "in light of the specific context of the case, not as a broad general proposition." *Id.* at 201, 121 S.Ct. 2151.

■ Regardless of whether there may exist a genuine issue of material fact on the merits as to the official's subjective state of mind, he may be entitled to qualified immunity, so long as the law governing his conduct was not sufficiently clear to put him "on notice" that what he was doing, or failing to do, was in violation of the Constitution. *Saucier*, 533 U.S. at 202, 121 S.Ct. 2151. In essence, the question is whether the official could have "reasonably

---

**3.** Moreover, even genuine issues of material fact as to the defendants' "deliberate indifference" under the Eighth Amendment will not necessarily preclude his claims to qualified immunity. *Estate of Ford v. Ramirez–Palmer*, 301 F.3d 1043, 1048–50 (9th Cir.2002). The court must "follow the *Saucier* framework" even when considering claims to qualified immunity in cases where the defendant's subjective state of mind is at issue. *Ford*, 301 F.3d at 1049–50 (acknowledging post-Saucier invalidity of *Hamilton v. Endell*, 981 F.2d

1062, 1066 (9th Cir.1992), to the extent it held that "[a] finding of deliberate indifference necessarily precludes a finding of qualified immunity."). "Courts may not simply stop with a determination that a triable issue of fact exists as to whether prison officials [acted unconstitutionally]; instead, the qualified immunity inquiry is separate from the constitutional inquiry." *Marquez v. Gutierrez*, 322 F.3d 689, 693 (9th Cir.2003) (citing *Estate of Ford*, 301 F.3d at 1053).

but erroneously believed that his or her conduct did not violate the plaintiff's rights." *Devereaux v. Abbey*, 263 F.3d 1070, 1074 (9th Cir.2001); *see also Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987).

■ At the time of Rosado's diagnosis in 2000, the legal standard for an Eighth Amendment claim for deliberate indifference to a serious medical condition was clearly established by the cases of *Estelle*, 429 U.S. at 105, 97 S.Ct. 285; *Farmer*, 511 U.S. at 825, 114 S.Ct. 1970, and *McGuckin*, 974 F.2d at 1050, which were, and still are, binding precedent in the Ninth Circuit. While *Estelle* sets forth the general proposition that prison officials may not act with "deliberate indifference to serious medical needs," *Estelle* itself noted deliberate indifference "is manifested by prison [officials] intentionally denying or delaying access to medical care," or "intentionally interfering with the treatment once prescribed" by a physician. *Estelle*, 429 U.S. at 104, 97 S.Ct. 285. It is also clearly established that "the existence of chronic and substantial pain" itself demonstrates a serious medical need. *McGuckin*, 974 F.2d at 1060. Any reasonable official would understand that to deny or delay an inmate's and his treating physician's request that he be evaluated for placement on an eligible organ recipient list, or to ignore his need for a transplant or other suitable treatment, would constitute deliberate indifference to a serious medical condition, and therefore violate the Eighth Amendment prohibition against cruel and unusual punishment. *See Johnson v. Wright*, 234 F.Supp.2d 352, 360 (S.D.N.Y.2002).

■ Further, the "clearly established" inquiry focuses on whether "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted," or whether the state of the law in 2000 gave "fair warning" to Defendants that their decisions to deny Plaintiff placement on the liver transplant recipient list was unconstitutional. *Saucier*, 533 U.S. at 202, 121 S.Ct. 2151; *Hope v. Pelzer*, 536 U.S. 730, 740, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002). "This inquiry, it is vital to note, must be undertaken in light of the specific context of the case." *Saucier*, 533 U.S. at 201, 121 S.Ct. 2151. Officials, however, "can still be on notice that their conduct violates established law, even in novel factual circumstances." *Hope*, 536 U.S. at 741, 122 S.Ct. 2508. Specificity only requires that the unlawfulness be apparent under preexisting law. *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987).

The general law regarding medical treatment of prisoners was clearly established during the period in which the alleged conduct occurred. *See Hamilton*, 981 F.2d at 1066 (overruled on other grounds). Furthermore, it was also clearly established that prison officials cannot intentionally deny or delay access to medical care. *Estelle*, 429 U.S. at 104–05, 97 S.Ct. 285. It may be true that "a resolution of the factual issues may well relieve the prison officials of any liability in this case." *Clement v. Gomez*, 298 F.3d 898, 906 (9th Cir.2002). However, *Saucier* instructs the Court at this stage of the proceedings to presume the Plaintiff's version of events as true. *Saucier*, 533 U.S. at 201, 121 S.Ct. 2151.

Moreover, "[p]recedent directly on point is not necessary to demonstrate that a right is clearly established." *Giebel v. Sylvester*, 244 F.3d 1182, 1189 (9th Cir.2001). However, the Ninth Circuit has held, even before *Estelle* was decided, that prison officials who know, yet ignore instructions of a prisoner's treating physician, violate the Constitution. *See, e.g., Tolbert v. Eyman*, 434 F.2d 625, 626 (9th Cir.1970); *see also Martinez v. Mancusi*, 443 F.2d 921, 924

(2d Cir.1970); *White v. Napoleon*, 897 F.2d 103, 106–10 (3d Cir.1990).

Here, Plaintiff presented evidence tending to show that C. Pickett acted with deliberate indifference to Rosado's needs by denying and then delaying treating physician Parsons' instruction that Rosado's transplant request be referred to the HCRC for approval, despite knowing that Rosado's other treating physicians agreed that his condition was classified as "end-stage liver disease" (Pl.'s Ex. B at AGO–027, 091, 093) and was "non-curable ... without liver transplant" (Pl.'s Ex. B at AGO–1587, 005). Because it would be clear to a reasonable official in C. Pickett's circumstances that such a denial would violate pre-existing Eighth Amendment principles which give officials fair warning that the "intentional interference with treatment once prescribed" by other doctors is prohibited, the Court **FINDS** that C. Pickett's decision is not protected by qualified immunity. *See Estelle*, 429 U.S. at 104–05, 97 S.Ct. 285 ("[D]eliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' ... proscribed by the Eighth Amendment .... whether the indifference is manifested by prison doctors in their response to the prisoner's needs ... or in *intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed.*") (emphasis added). For these reasons, Defendants' Motion for Summary Judgment on qualified immunity grounds **IS DENIED.**

## IV. *Negligence Claims*

■ Defendants move for summary judgment on Plaintiff's medical negligence claims. (*See* Defs.' Mem. Supp. Mot. for Summ. J. at 12.) Defendants argue that Plaintiff's professional negligence claims are barred by failure to comply with Section 364 of the California Code of Civil Procedure. Section 364(a) provides that

"[n]o action based upon the health care provider's professional negligence may be commenced unless the defendant has been given at least 90 days' prior notice of the intention to commence the action." Cal. Civ.Proc.Code § 364(a). In this case, Defendants argue that Plaintiff failed to give each Defendant health care provider prior notice of intention to commence this action for professional negligence. *Id.*

However, while failure to comply with Section 364 is grounds for professional discipline, the failure to comply "shall not invalidate any proceedings of any court of this state, nor shall it affect the jurisdiction of the court to render a judgment therein." Cal.Civ.Proc.Code § 365. "By the express language of section 365, failure to comply does not go to the maintenance of the action, but merely provides for professional discipline against the errant attorney." *Toigo v. Hayashida*, 103 Cal. App.3d 267, 269, 162 Cal.Rptr. 874 (Cal.Ct. App.1980) (reversing lower courts grant of defendant's motion to strike for failure to comply with Section 364); *see also Edwards v. Superior Ct.*, 93 Cal.App.4th 172, 179, 112 Cal.Rptr.2d 838 (Cal.Ct.App.2001). Accordingly, Plaintiff's alleged failure to comply with Section 364 does not serve to bar her claims for professional negligence.

■ In any medical malpractice action, the plaintiff must establish: "(1) the duty of the professional to use such skill, prudence, and diligence as other members of his profession commonly possess and exercise; (2) a breach of that duty; (3) a proximate causal connection between the negligent conduct and the resulting injury; and (4) actual loss or damage resulting from the professional's negligence." *Tortorella v. Castro*, 140 Cal.App.4th 1, 3 n. 2, 43 Cal.Rptr.3d 853 (Cal.Ct.App.2006). The standard of care against which the acts of a physician are to be measured is a "matter peculiarly within the knowledge of ex-

perts; it presents the basic issue in a malpractice action and can only be proved by their testimony." *Flowers v. Torrance Mem'l Hosp. Medical Ctr.*, 8 Cal.4th 992, 1001, 35 Cal.Rptr.2d 685, 884 P.2d 142 (1994) "When a defendant moves for summary judgment and supports his motion with expert declarations that his conduct fell within the community standard of care, he is entitled to summary judgment unless the plaintiff comes forward with conflicting expert evidence." *Munro v. Regents of Univ. of Cal.*, 215 Cal.App.3d 977, 984–85, 263 Cal.Rptr. 878 (1989).

Defendants argue that the testimony of Doctors Saab, Hamdy, and Goldfarb to establish that no Defendant was negligent in providing medical care to Rosado. (*See* Defs.' Mem. Supp. Mot. for Summ. J. at 11.) However, Defendants again fail to specify the location of such specific testimony concerning the issue of negligence. *See supra* n. 2. Nevertheless, as described above, Defendants have provided declarations stating that Defendants Alameida, M. Pickett, Steinberg, Sawires, and Giurbino did not provide care and treatment to Rosado nor were they aware of or had control over any policy prohibiting inmate transplants. (*See* Ex. A, Alameida Decl.; Ex. B, M. Pickett Decl.; Ex. C, Steinberg Decl.; Ex. H, Sawires Decl.; Ex. I, Giurbino Decl.) Additionally, Defendants set forth declarations indicating that the care and treatment provided by Defendants Parsons and Thornton were adequate and appropriate. (*See* Ex. F, Parsons Decl.; Ex. G, Thornton Decl.) Plaintiff has failed to provide any evidence to the contrary. Accordingly, the Court GRANTS summary judgment on Plaintiff's negligence claim against Defendants Alameida, M. Pickett, Steinberg, Sawires, Giurbino, Parsons, and Thornton.

■ However, with respect to Defendant C. Pickett, Plaintiff points to the evidence set forth above as part of Plaintiff's Eighth Amendment claims to prove that the denial and delay of medical care by C. Pickett fell far below the community standard of care. (Pl.'s Opp'n at 25.) In fact, Plaintiff points to the deposition of Defendants' expert, Dr. Goldfarb, in which he was asked: "Under the community standard of care, is it acceptable to categorically refuse to submit a prisoner for evaluation for liver transplantation because of their status as prisoner?" (Pl.'s Ex. M, Goldfarb Dep. at 56:23–25, 57:1.) Dr. Goldfarb testified that "if the only reason that they refused to offer a service, an option to be evaluated for a transplant, is the fact they're [sic] a prisoner at the time, I think that would be inappropriate." (*See id.* at 57:3–10.) Dr. Sawires also testified that "[i]f the inmate has an end-stage liver disease, he should be sent for evaluation to get a new organ," and that "it would violate the standard of care to deny a transplant because the individual was a prisoner." (*See* Pl.'s Ex. F, Sawires Dep. at 59:13–23.) Thus, summary judgment is not appropriate as to the negligence claim against C. Pickett.

Accordingly, the Court GRANTS summary judgment on Plaintiff's negligence claim against Defendants Alameida, M. Pickett, Steinberg, Sawires, Giurbino, Parsons, and Thornton; and DENIES summary judgment on Plaintiff's negligence claim against Defendant C. Pickett.

### Conclusion

For the reasons set forth above, the Court hereby:

1) DISMISSES the action against Defendant Smith;

2) DENIES Defendants' Motion for Summary Judgment as to Plaintiff's Eighth Amendment claims against C. Pickett; and GRANTS Defendants' Motion for Summary Judgment as to Plaintiff's Eighth Amendment claims against Defendants Alameida, M. Pickett, Steinberg, Sa-

wires, Giurbino, Parsons, and Thornton; and

3) **DENIES** Defendants' Motion for Summary Judgment as to Plaintiff's negligence claim against Defendant C. Pickett; and **GRANTS** Defendants' Motion for Summary Judgment as to Plaintiff's negligence claim against Defendants Alameida, M. Pickett, Steinberg, Sawires, Giurbino, Parsons, and Thornton.

**IT IS SO ORDERED.**